853 A.2d 298 (2004)
371 N.J.Super. 349
Armando GONZALEZ and Mirna Padilla Gonzalez, Plaintiffs-Appellants,
v.
IDEAL TILE IMPORTING CO., INC., and Komatsu Forklift, U.S.A., Inc., Defendants-Respondents, and
Kalmar AC of Columbus, Inc., Kalmar-AC Handling Systems, Inc., Lift Trucks, Inc., and Henson Truck & Forklift Service, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 11, 2004.
Decided July 22, 2004.
*300 Edward F. Colrick, argued the cause for appellants (McGovern, Provost & Colrick, attorneys; Mr. Colrick, of counsel and on the brief).
Wendy L. Mager, Princeton, argued the cause for respondent, Ideal Tile Importing Co., Inc. (Smith, Stratton, Wise, Heher & Brennan, attorneys; Ms. Mager, of counsel and on the brief).
Dennis P. Ziemba, Philadelphia, PA, argued the cause for respondent Komatsu Forklift U.S.A., Inc. (Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray, attorneys; William J. Ricci and Mr. Ziemba, of counsel; Messrs. Ricci and Ziemba, and Richard B. Wickersham, Jr., on the brief).
Before Judges COBURN, WELLS and C.S. FISHER.
The opinion of the court was delivered by
*301 FISHER, J.A.D.
Plaintiff and his wife commenced this action, alleging a workplace injury. The trial judge granted both the summary judgment motion of defendant Ideal Tile Importing Co., Inc., finding plaintiff to be Ideal's employee and his claim barred by N.J.S.A. 34:15-8, and the summary judgment motion of defendant Komatsu Forklift, U.S.A., Inc., holding that claim preempted by federal law. We affirm.

I
Plaintiff claimed he was injured at his workplace when struck by one forklift and pinned against another. Ideal moved for summary judgment, asserting that plaintiff was an employee and his claim precluded by N.J.S.A. 34:15-8, which generally renders an employee's workers' compensation claim the sole remedy against the employer. Wellenheider v. Rader, 49 N.J. 1, 9, 227 A.2d 329, 333 (1967).
On February 1, 2001, the first judge assigned to the matter rendered an oral decision which unequivocally indicated that Ideal's motion for summary judgment would be denied in order to allow the parties to explore in discovery the fact disputes surrounding plaintiff's relationship with Ideal. Notwithstanding that ruling, the judge entered three orders  one which denied Ideal's motion and allowed the parties to seek discovery on the employment issues, a second which granted Ideal's summary judgment motion, and the third, entered on February 16, 2001, which stated that plaintiff was not an employee of Ideal. Further confusion was generated a year later when Ideal moved again for summary judgment and sought reconsideration of the February 16, 2001 order. On March 22, 2002, the judge entered an order which granted reconsideration of the February 16, 2001 order without adequately explaining how the order was reconsidered or revised.
The case was later assigned to Judge Thomas W. Cavanagh, Jr. Ideal again moved for reconsideration and summary judgment. Judge Cavanagh granted both motions for reasons set forth in his December 17, 2002 oral decision. Plaintiff argues on appeal that reconsideration of the February 16, 2001 order was barred by the "law of the case" doctrine and, in any event, summary judgment was mistakenly entered in favor of Ideal. We disagree with both contentions.
Unquestionably, the prior orders were interlocutory because they did not resolve, either individually or collectively, all issues as to all parties. As a result, those orders remained "subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of justice." R. 4:42-2.[1] While the discretion to revisit an interlocutory order requires consideration of the law of the case doctrine, plaintiff's contentions appear to rest on the mistaken impression that this doctrine represents an absolute rule. While the law of the case *302 doctrine reflects an important judicial policy that "once an issue is litigated and decided in a suit, relitigation of that issue should be avoided if possible," it is nevertheless a discretionary guideline. Sisler v. Gannett Co., Inc., 222 N.J.Super. 153, 159, 536 A.2d 299, 302 (App.Div.1987), certif. denied, 110 N.J. 304, 540 A.2d 1283 (1988). The respect and deference which should be given to prior rulings in the same case "must be balanced against other considerations, particularly the impact of new law or new facts," Rosenberg v. Otis Elevator Co., 366 N.J.Super. 292, 302, 841 A.2d 99, 105 (App.Div.2004), or, we would add, where the confusing nature of the prior decisions requires clarification. In short, the law of the case doctrine does not obligate a judge to slavishly follow an erroneous or uncertain interlocutory ruling. See Cineas v. Mammone, 270 N.J.Super. 200, 207, 636 A.2d 1071, 1074 (App.Div.1994); McBride v. Minstar, Inc., 283 N.J.Super. 471, 481, 662 A.2d 592, 597 (Law Div.1994), aff'd o.b., 283 N.J.Super. 422, 662 A.2d 567 (App.Div.), certif. denied, 143 N.J. 319, 670 A.2d 1061 (1995).
In addition, Ideal correctly argues that an order denying summary judgment is not subject to the law of the case doctrine because it decides nothing and merely reserves issues for future disposition. See Franklin Med. Assocs. v. Newark Pub. Schools, 362 N.J.Super. 494, 512, 828 A.2d 966, 976-77 (App.Div.2003); Blunt v. Klapproth, 309 N.J.Super. 493, 504, 707 A.2d 1021, 1026 (App.Div.1998); A & P Sheet Metal Co., Inc. v. Edward Hansen, Inc., 140 N.J.Super. 566, 573, 357 A.2d 37, 40 (Law Div.1976). Accordingly, we reject plaintiff's contention that the first judge's orders regarding plaintiff's relationship to Ideal precluded Judge Cavanagh's consideration of Ideal's last motion for summary judgment.
We also subscribe to Judge Cavanagh's ruling that Ideal was plaintiff's employer and, thus, insulated from suit by N.J.S.A. 34:15-8, even though plaintiff was also an employee of EMI, which entered into a leasing agreement with Ideal. The undisputed facts presented by Ideal's summary judgment motion revealed that (1) plaintiff's work relationship was with Ideal only; (2) the work plaintiff performed was for Ideal's benefit; (3) plaintiff never received instructions from anyone other than Ideal representatives; (4) Ideal was the source of plaintiff's wages; and (5) Ideal had the power to hire and fire plaintiff. Judge Cavanagh correctly applied these undisputed facts to the legal principles contained in Volb v. G.E. Capital Corp., 139 N.J. 110, 116, 651 A.2d 1002, 1004-05 (1995) and Kelly v. Geriatric and Med. Servs., Inc., 287 N.J.Super. 567, 573, 671 A.2d 631, 634 (App.Div.), aff'd, 147 N.J. 42, 685 A.2d 943 (1996), in finding that plaintiff was an Ideal employee. We affirm substantially for the reasons set forth in his thorough and well-reasoned oral decision of December 17, 2002.

II
In considering Komatsu's motion for summary judgment, Judge Cavanagh correctly observed that plaintiff's only response to Komatsu's forty-two paragraph statement of undisputed facts was his counsel's one-page conclusory and unsworn letter which stated, in its entirety:
The plaintiff takes exception with the defendant's list of undisputed facts in its entirety. The only undisputed fact that plaintiff believes is relevant here is that the plaintiff was severely injured as the result of the defendant's failure to design a lift truck with back-up warning devices and also its failure to communicate the availability of such devices to the end user.

*303 With respect to the qualifications of plaintiff's expert, Mr. Niles expertly withstood two full days of grilling by defendant's attorney. Mr. Niles['s] credentials as a safety expert have been accepted in the many courts wherein he has given expert testimony over many years.
This general demurrer inadequately challenged Komatsu's detailed and annotated statement of material facts. See R. 4:46-2(b)(An opponent of a summary judgment motion "shall file a responding statement either admitting or disputing each of the facts in the movant's statement."); Housel v. Theodoridis, 314 N.J.Super. 597, 602, 715 A.2d 1025, 1028 (App.Div.1998).
In addition, since it was not a statement based upon personal knowledge, counsel's unsworn opposing letter was incapable of conveying any facts for summary judgment purposes. Even an attorney's sworn statement will have no bearing on a summary judgment motion when the attorney has no personal knowledge of the facts asserted. R. 4:46-5(a); Murray v. Allstate Ins. Co., 209 N.J.Super. 163, 169, 507 A.2d 247, 250 (App.Div.1986); see also Inglett & Co. v. Everglades Fertilizer Co., 255 F.2d 342, 349 (5th Cir.1958) ("[W]e think it an unnatural, if not virtually impossible, task for counsel, in his own case, to drop his garments of advocacy and take on the somber garb of an objective fact-stater."). Here, counsel did not even swear to, or certify, the "facts" he was attempting to convey through his letter in opposition to summary judgment. Accordingly, we agree with the judge's determination that Komatsu's R. 4:46-2(a) statement was undisputed.
Komatsu's statement of undisputed facts revealed that plaintiff sustained injuries from having been struck by a Kalmar Model C50 forklift operated in reverse by a coworker. Komatsu claims to have played a limited role in the production of the forklift. The factual record reveals an agreement among three parties regarding the production of forklifts. By way of this agreement, Komatsu agreed to supply another Japanese corporation, Nichimen Corporation, with certain forklift components. Nichimen promised to supply the Komatsu components, as well as its own additional components, to another party to the agreement, AC Handling Systems, Inc., an Ohio corporation,[2] which then manufactured, assembled and eventually sold the forklift to Lift Trucks, Inc., which apparently sold it to Ideal, plaintiff's employer.
In seeking summary judgment, Komatsu posed three arguments: (1) state tort claims for workplace injuries are preempted when the allegedly defective product was manufactured in compliance with federal regulations; (2) plaintiff's expert was not qualified to render an opinion about the design and manufacture of forklifts and, without expert testimony, plaintiff's claim could not succeed; and (3) Komatsu, as a supplier of component parts, could have no liability for the absence of the safety devices which plaintiff claimed were required. Judge Cavanagh discussed all these issues in his oral decision but expressly declined to determine whether the second or third arguments warranted the entry of summary judgment, ruling instead that federal preemption barred the claim.
Komatsu's preemption argument requires that we first consider the purpose *304 of the federal law which, according to Komatsu, preempts plaintiff's claim. Congress enacted the Occupational Safety and Health Act (the OSH Act), 29 U.S.C.A. § 651 to § 678, to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C.A. § 651(b). In pursuing those goals, Congress authorized the Secretary of Labor to promulgate health and safety standards for workplaces, 29 U.S.C.A. § 655, and established the Occupational Safety and Health Administration (OSHA) to enforce those standards through inspections and investigations, 29 U.S.C.A. § 657. The OSH Act requires employers to comply with specific OSHA standards and also imposes a general duty on employers to provide a workplace "free from recognized hazards that are causing or are likely to cause death or serious physical harm." 29 U.S.C.A. § 654(a). Violators of specific OSHA standards or OSHA's general duty to provide a safe workplace face civil monetary penalties, as well as criminal sanctions, 29 U.S.C.A. § 666.
In considering the impact of OSHA's regulations upon the manufacture of forklifts, we initially observe that neither party has argued that the OSH Act applies only to "employers," 29 U.S.C.A. § 652, and, for that reason, may not govern Komatsu's involvement in the production of forklifts. See McKinnon v. Skil Corp., 638 F.2d 270, 275 (1st Cir.1981). Certainly, if the OSH Act does not apply to the manufacturer of a product supplied to a workplace regulated by OSHA, then the product manufacturer's federal preemption defense would fail; a claim cannot be federally preempted in the absence of federally-imposed duties and obligations. However, in this appeal, we need not determine OSHA's reach because both parties have proceeded on the assumption that Komatsu was bound by OSHA's forklift standards. Both parties accept the premise that OSHA's standards govern product manufacturers; their only dispute is whether OSHA's standards permit state supplementation or whether OSHA's standards constitute the sole standard by which plaintiff's claim against Komatsu must be assessed. Since plaintiff has abandoned, by not raising, an argument that federal preemption cannot attach to a regulation which does not bind a product manufacturer, we assume without deciding, since Komatsu concedes, that OSHA's forklift regulations are binding on Komatsu and not just informative or evidential of the standard of care applicable to a manufacturer or seller.[3]
The Secretary of Labor adopted a regulation which states that "[a]ll new powered industrial trucks acquired and used by an employer ... shall meet the design and construction requirements for powered industrial trucks established in the `American National Standard for Powered Industrial Trucks,'...." 29 C.F.R. § 1910.178(a)(2). Among these ANSI standards is the requirement that forklifts "be equipped with an operator controlled horn, whistle, gong, or other sound-producing device(s)." These regulations, however, do not require inclusion of an "automatic audible alarm," "an automatic *305 flashing light of some sort," or "a system of mirrors" which plaintiff's expert claims were necessary to render this forklift a safe product. Instead, ANSI indicates that "other devices (visible or audible) suitable for the intended area of use may be installed when requested by the user." Plaintiff argues that these ANSI standards create only a floor, or a minimum safety standard, and the failure of the ANSI standard to require additional warning devices  the absence of which has led his expert to conclude that the forklift was an unsafe product  allows this area to be regulated by the States.
In considering whether this product liability action  a type of state regulation[4]  is preempted by federal law, we are required to recognize that, by way of the OSH Act, Congress brought the federal government "into a field that traditionally had been occupied by the States." Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 96, 112 S.Ct. 2374, 2382, 120 L.Ed.2d 73, 83 (1992) (plurality opinion of four justices). As a result, Komatsu's argument that it is bound only to comply with OSHA regulations, and cannot be put to some greater or different state standard, requires that we examine the intent of Congress, "the ultimate touchstone" in such matters. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206, 214 (1985). Since federal preemption "has grown from little more than a blip on the radar screen to one of the most powerful defenses in all of products liability law," David G. Owen, Federal Preemption of Products Liability Claims, 55 S.C.L.Rev. 411, 412 (2003), the guiding principles which have accumulated  principles which have been greatly criticized, id. at 412-13, and viewed by some critics as "highly politicized," Scott A. Smith & Duana Grage, Federal Preemption of State Products Liability Actions, 27 Wm. Mitchell L.Rev. 391, 415 (2000)  instruct that federal preemption may arise in a number of ways.
The Supreme Court has explained that preemption may be expressed or implied, and that implied preemption comes in two types  field preemption and conflict preemption. Expressed preemption is determined from an examination of the explicit language employed by Congress. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 613-14 (1977). The two types of implied preemption have been described in the following way:
[F]ield pre-emption [is] where the scheme of federal regulation" `is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' "and conflict preemption [is] where "compliance with both federal and state regulations is a physical impossibility," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."
[Gade, supra, 505 U.S. at 98, 112 S.Ct. at 2383, 120 L.Ed.2d at 84 (citations omitted).]
As our own Supreme Court has held, these three categories are "anything but analytically air-tight." R.F. v. Abbott Labs., 162 N.J. 596, 618, 745 A.2d 1174, 1187 (2000) (quoting Laurence H. *306 Tribe, American Constitutional Law, Vol. I, § 6-28 (3rd ed. 2000)). Instead, the process of determining whether federal law preempts state law "is a fact-sensitive endeavor, based on a court's review of `fragments of statutory language, random statements in the legislative history, and the degree of detail of the federal regulation.'" R.F., supra, at 619, 745 A.2d at 1187 (quoting Erwin Chemerinsky, Constitutional Law: Principles and Policies, § 5.2 (1997)).[5]
In examining the language of the applicable statutes and the purposes of the OSH Act, we also must presume that "Congress did not intend to displace state law," Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 595 (1981), particularly where, as here, the field which Congress is said to have preempted has been traditionally occupied by the States, Jones v. Rath Packing Co., supra, 430 U.S. at 525, 97 S.Ct. at 1309, 51 L.Ed.2d at 613. In short, preemption "is not to be lightly presumed," Turner v. First Union Nat'l Bank, 162 N.J. 75, 88, 740 A.2d 1081, 1088 (1999).
It has also been determined that expressed preemption, field preemption and conflict preemption are not mutually exclusive. The Supreme Court recently observed that there are circumstances where field or conflict preemption will be found to bar state regulation even though the explicit language of a statute purports to save state regulation from preemption. Geier v. Am. Honda Motor Co., 529 U.S. 861, 869, 120 S.Ct. 1913, 1919, 146 L.Ed.2d 914, 924 (2000) ("[T]he saving clause (like the express pre-emption provision) does not bar the ordinary working of conflict pre-emption principles.").
Ascertaining the intent of Congress, for present purposes, requires that we consider two statutes, the first of which states:
Nothing in this Act shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.
[29 U.S.C.A. § 653(b)(4).]
The great majority of federal courts have concluded that this statute reveals the intent of Congress to save from preemption the existing state rights and remedies which employees possess against their employers, including any state tort claims. See Pedraza v. Shell Oil Co., 942 F.2d 48, 53-54 (1st Cir.1991), cert. denied, 502 U.S. 1082, 112 S.Ct. 993, 117 L.Ed.2d 154 (1992); Frohlick Crane Serv., Inc. v. Occupational Safety and Health Review Comm., 521 F.2d 628, 631 (10th Cir.1975); Wickham v. Am. Tokyo Kasei, Inc., 927 F.Supp. 293, 294 (N.D.Ill.1996); Startz v. Tom Martin Constr. Co., Inc., 823 F.Supp. 501, 505 (N.D.Ill.1993); York v. Union Carbide Corp., 586 N.E.2d 861, 866 (Ind.App.1992); Dukes v. Sirius Constr., Inc., 316 Mont. 226, 73 P.3d 781, 791-92 (2003); Note, The Extent of OSHA Preemption of State Hazard Reporting Requirements, 88 Colum. L.Rev. 630, 641 (1988); see also Millison v. E.I. du Pont de Nemours and Co., 226 N.J.Super. 572, 594, 545 A.2d 213, 224 (App.Div.1988) ("OSHA regulations were intended neither to create nor to *307 destroy common law rights and liabilities of employers or employees arising out of employment."), aff'd, 115 N.J. 252, 558 A.2d 461 (1989). In addition, it has been held that 29 U.S.C.A. § 653(b)(4) not only saves from preemption state law claims which an employee may possess against an employer but also the employee's tort claims against others as well. As the Court of Appeals for the First Circuit concluded, it is highly unlikely that, by expressly preserving state law claims against employers in 29 U.S.C.A. § 653(b)(4), Congress decided to silently preempt "the right of an employee to bring an action for damages against a third-party supplier of products used in the workplace." Pedraza, 942 F.2d at 54 n.6.[6] For these reasons, we agree with Pedraza that 29 U.S.C.A. § 653(b)(4) saves from preemption not only claims against employers but also claims against others whose products are supplied to employers for use in the workplace.
In short, from the existence of the savings clause, 29 U.S.C.A. § 653(b)(4), we are persuaded that Congress believed "there are some significant number of common-law liability cases to save." Geier, supra, 529 U.S. at 868, 120 S.Ct. at 1918, 146 L.Ed.2d at 923. This does not, however, end the inquiry into whether plaintiff's claim against Komatsu may be considered preempted. What the savings clause allows may be taken away by what the preemption clause precludes.
OSHA's preemption clause, 29 U.S.C.A. § 667(a), states that "[n]othing in this [Act] shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect." On its face, this preemption clause directs that the state actions saved from preemption by 29 U.S.C.A. § 653(b)(4) are those in which a state provides standards other than those established by federal law. In considering the give-and-take of such savings and preemption clauses, the Supreme Court concluded that an analogous preemption clause should be read narrowly:
Without the saving clause, a broad reading of the express pre-emption provision arguably might pre-empt those actions, for, as we have just mentioned, it is possible to read the pre-emption provision, standing alone, as applying to standards imposed in common-law tort actions, as well as standards contained in state legislation or regulations. And if so, it would pre-empt all nonidentical state standards established in tort actions covering the same aspect of performance as an applicable federal standard, even if the federal standard merely established a minimum standard. On that broad reading of the pre-emption clause little, if any, potential "liability at common law" would remain. And few, if any, state tort actions would remain for the saving clause to save. We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances. Hence the broad reading cannot be correct. The language of the pre-emption provision permits a narrow reading that excludes common-law actions. Given the *308 presence of the saving clause, we conclude that the pre-emption clause must be so read.
[Geier, supra, 529 U.S. at 868, 120 S.Ct. at 1918, 146 L.Ed.2d at 923.]
For these same reasons, we also conclude that 29 U.S.C.A. § 653(b)(4), in general, saves state tort actions from being preempted by 29 U.S.C.A. § 667(a).[7]
This, however, does not necessarily mean that preemption may not be found through a consideration of field preemption and conflict preemption principles. Geier instructs that these other principles should be considered, even when the express statutory provisions preserve state law tort remedies. 529 U.S. at 869, 120 S.Ct. at 1919, 146 L.Ed.2d at 924. We conclude, essentially for the same reasons which prompted our conclusion that 29 U.S.C.A. § 653(b)(4) saves state tort law from preemption, that Congress has not pervasively regulated the field and left no room for state supplementation of the standards which govern workplace safety. Thus, field preemption does not apply to bar plaintiff's claim herein.
Ascertaining whether conflict preemption applies is a more difficult matter. Our decision is complicated by the inability of a majority of the members of the Supreme Court to reach an agreement, in Gade, as to the OSH Act's consequences for state tort law. While it is true that a majority of five justices agreed that the OSH Act preempted an Illinois statute which required the licensing of hazardous waste equipment operators and laborers, a holding which is quite distinct and, thus, does not control the arguments presented herein, those five justices could not agree on whether preemption was expressed or implied. In her plurality opinion, Justice O'Connor expressed her view, and the view of three other members of the Court, which lies at the heart of Komatsu's position, and Judge Cavanagh's holding, that conflict preemption provisions require a finding of federal preemption:
The design of [the OSH Act demonstrates] that Congress intended to subject employers and employees to only one set of regulations, be it federal or state, and that the only way a State may regulate an OSHA-regulated occupational safety and health issue is pursuant to an approved state plan that displaces the federal standards.
....
[T]he natural implication of [29 U.S.C.A. § 667(a)] is that state laws regulating the same issue as federal laws are not saved, even if they merely supplement the federal standard.
[Gade, supra, 505 U.S. at 99-100, 112 S.Ct. at 2383-84, 120 L.Ed.2d at 84.]
If this was the standard by which we should examine whether plaintiff's claim against Komatsu was preempted, we would agree with Komatsu that any alternative state standard regarding forklift warning devices, even if purely supplemental, would conflict with the ANSI standards incorporated by OSHA. However, Justice O'Connor's broad description of conflict preemption constituted a minority view. Four other justices dissented from the Court's judgment, and a fifth, Justice Kennedy, concurred in the judgment but disagreed with this aspect of Justice O'Connor's opinion, stating:
I do not believe that supplementary state regulation of an occupational safety *309 and health issue can be said to create the sort of actual conflict required by our decisions. The purpose of state supplementary regulation, like the federal standards promulgated by [OSHA], is to protect worker safety and health. Any potential tension between a scheme of federal regulation of the workplace and a concurrent supplementary state scheme would not, in my view, rise to the level of "actual conflict" described in our pre-emption cases.
[Id. at 110-11, 112 S.Ct. at 2389, 120 L.Ed.2d at 92 (concurring opinion).]
Thus, the theory of preemption espoused by Komatsu was not adopted by a majority of the Court in Gade,[8] and whether a state may permissibly supplement a federal standard was left for another day. The Supreme Court's subsequent decision in Geier gives some insight into this unresolved question.
In considering the precise limits of the OSH Act's preemption of state regulation, and whether the OSH Act permits supplementation of OSHA regulations, Geier demonstrates, in its consideration of similar questions in an unrelated area of manufacturing, the importance of the principles of conflict preemption. Conflict preemption requires a close examination of both the intent of the federal regulation and the purpose of the questioned state regulation. Put in context, OSHA's preemption clause, 29 U.S.C.A. § 667(a), directs that OSHA does not "prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect." Stated another way, this preemption clause means that States may not assert jurisdiction over any occupational safety or health issue which is governed by a federal standard. Despite the preemption clause's central theme that non-conflicting standards may be enforced, the more difficult question posed by plaintiff, and which was not resolved by Gade, concerns the validity of state regulation which is only supplemental to federal regulations, i.e., does the federal standard regarding forklift warning devices merely set forth a minimum safety standard, and, if so, may a more expansive state standard be imposed?
In Geier, the Court considered this problem in the context of federal regulation regarding automobile airbags. The Court explained the long history of federal attempts to render the use of automobiles more safe by requiring the installation of seatbelts and passive restraints of various sorts. In weighing the advantages and disadvantages of restraint systems, the Department of Transportation adopted a regulation which required manufacturers to equip some but not all 1987 vehicles with passive restraints. In seeking damages, Geier claimed that an automobile manufacturer, who was in compliance with the DOT standard, should have equipped the automobile in question with airbags. Id. at 864, 120 S.Ct. at 1916-17, 146 L.Ed.2d at 921-22. The Court determined that the regulation "deliberately sought a gradual phase-in of passive restraints," requiring manufacturers to equip only 10% of their car fleet manufactured after a certain date with passive restraints, with the intention to increase that percentage in three annual stages, until all vehicles were so equipped by a later date. Id. at 879, 120 S.Ct. at 1924, 146 L.Ed.2d at 930. As a result, the Court concluded that the claim that a complying manufacturer should have equipped a particular automobile with an airbag was in conflict with the gradual phase-in mandated by federal regulation. In other words, at the time in *310 question, the federal regulation was 10% mandatory and 90% optional. This did not mean that 10% was a floor above which a state could regulate; instead, making installation of airbags optional for 90% of the vehicles was also a federal standard which could not be altered by state regulation. In this way, Geier illuminates the manner in which we should examine the ANSI forklift standards and the preemption controversy raised in this appeal.
Upon examining the content of the ANSI standards, and their intended meaning, we conclude that plaintiff's product liability theory suggests a standard that is in direct conflict, and not merely supplemental, to the ANSI standards. Two ANSI standards demonstrate this conflict. The first requires that forklifts be equipped with an operator controlled horn, while the second declares that "other devices (visible or audible) suitable for the intended area of use may be installed when requested by the user." As can be seen, ANSI does not leave open an area where the States may regulate with regard to "other" warning devices. Instead, like the phased-in airbag regulation considered in Geier, ANSI specifically creates a standard for "other" warning devices, requiring the user to determine their need, dependent upon the "intended area of use."
ANSI's interpretation of these standards[9] demonstrates that OSHA requires that such additional warning devices should not be installed absent a contrary determination by the user:
[T]he user [should] consider certain factors to enhance a safe operation. He may use his own judgement or that of one with more experience.
The myriad combinations related to lighting, ambient noise levels, traffic routes for both materials and personnel, floor conditions, proximity of machinery, equipment and work stations, etc., suggest that this would be a difficult subject to cover in a standard with finite verbiage.
The support for using additional audio and/or visual alarms is that it may promote safety. The argument against indiscriminate use of additional alarms is that it might encourage the driver to ignore his responsibility of looking in the direction of travel and being alert to impending danger. Also, automatic continuous alarms can become so commonplace that they will soon be ignored by persons in the area.
[ANSI/ASME B56.1-1983, Interpretation 1-6.]
As can be seen, the ANSI standards do not merely set a mandatory minimum for forklift safety devices, but regulate the universe of warning devices, concluding that the inclusion of warning devices other than an operator-controlled horn, may tend to create more dangers than they prevent and, thus, should depend upon the conditions in which the forklift is used, as determined by the owner/user. Plaintiff urges application of a product liability standard regarding "other" warning devices that, by being more rigorous, attempts not to supplement, but to supplant, OSHA's more discretionary regulation. In short, the result of ANSI's expertise in this area  which OSHA coopted  was its conclusion that the "other" warning devices, which plaintiff alleges were required to render the forklift safe, actually may tend to create additional dangers in the *311 workplace. That is a standard, not the absence of a standard, and the state regulation urged by plaintiff, through the imposition of tort liability, would stand "as an obstacle to the accomplishment and execution of" the federal regulation regarding additional warning devices. Geier, supra, 529 U.S. at 881, 120 S.Ct. at 1925, 146 L.Ed.2d at 932 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581, 587 (1941)). Accordingly, we conclude that plaintiff's claim for damages based upon Komatsu's alleged failure to comply with a standard which conflicts with OSHA's standards was properly dismissed.
Affirmed.
COBURN, J.A.D., dissenting.
Although I agree with the majority's opinion affirming the judgment in favor of defendant Ideal Tile Importing Co., Inc., I respectfully dissent from the affirmance of the judgment in favor of defendant Komatsu Forklift, U.S.A., Inc.
In McKinnon v. Skil Corp., 638 F.2d 270, 275 (1st Cir.1981), the court held that OSHA only applies to employers and not to third-party tort claims. That point was reiterated in Pedraza v. Shell Oil Co., 942 F.2d 48, 52-54 (1st Cir.1991), cert. denied, 502 U.S. 1082, 112 S.Ct. 993, 117 L.Ed.2d 154 (1992). I agree with those cases, and therefore believe that Komatsu's preemption argument is without merit.
I disagree with the majority's suggestion that plaintiffs have accepted the premise that OSHA's standards govern product manufacturers because they failed to argue that OSHA applies only to employers. Instead, I believe that plaintiffs' position in this regard is clearly inferable from their argument that OSHA does not preempt third-party tort claims.
Although I would reverse the judgment in favor of Komatsu, I would remand the case for determination of the other points raised by Komatsu but left undecided by the trial court.
NOTES
[1] Plaintiff argues, in part, that the February 16, 2001 order was a declaratory judgment and, therefore, final and appealable when entered. There is nothing, however, in plaintiff's complaint which would indicate that declaratory relief was sought, and there was no statement in the order of February 16, 2001 which would suggest that the judge thought he was entering a declaratory judgment. Moreover, plaintiff's reliance upon N.J.S.A. 2A:16-59, which states that "[a] declaratory judgment ... shall have the force and effect of a final judgment," is misplaced. This statute does not convert a declaratory judgment, which resolves less than all issues as to all parties, into an appealable order, as the Court of Errors and Appeals explained long ago. Essex Foundry v. Biondella, 126 N.J.L. 157, 161, 17 A.2d 568, 570 (E. & A.1941).
[2] AC Handling Systems, Inc. appears to have a relationship to defendant Kalmar-AC Handling Systems, Inc. (Kalmar), which has not been clarified by the record on appeal. Plaintiff's claim against Kalmar was dismissed without prejudice by way of a stipulation executed by counsel on February 5, 2003.
[3] Even if not binding, the OSHA regulation could potentially be admitted in evidence to shed light on the manufacturer's standard of care. See Costantino v. Ventriglia, 324 N.J.Super. 437, 442, 735 A.2d 1180, 1183 (App.Div.1999), certif. denied, 163 N.J. 10, 746 A.2d 456 (2000); Kane v. Hartz Mountain, 278 N.J.Super. 129, 141-42, 650 A.2d 808, 813-14 (App.Div.1994), aff'd o.b., 143 N.J. 141, 669 A.2d 816 (1996); Smith v. Kris-Bal Realty, Inc., 242 N.J.Super. 346, 352, 576 A.2d 934, 937-38 (App.Div.1990); Sanna v. Nat'l Sponge Co., 209 N.J.Super. 60, 69, 506 A.2d 1258, 1263 (App.Div.1986).
[4] State regulation "can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 521, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407, 426 (1992) (citing San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775, 784 (1959)).
[5] Administrative regulations, when authorized by statute, have the same preemptive effect as federal statutes, Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153-54, 102 S.Ct. 3014, 3022-23, 73 L.Ed.2d 664, 675 (1982), which is ascertained in the same manner, R.F., supra, 162 N.J. at 619, 745 A.2d 1174.
[6] Similarly, in determining whether the Atomic Energy Act, 42 U.S.C.A. § 2011 to § 2284, preempted state claims for compensatory and punitive damages, the Supreme Court held that "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L. Ed.2d 443, 454 (1984). See also Cipollone, supra, 505 U.S. at 520, 112 S.Ct. at 2619, 120 L.Ed.2d at 425.
[7] While the Court's opinion in Geier concerned provisions contained in the National Traffic and Motor Vehicle Act, 15 U.S.C.A. § 1381 to § 1431, and not the OSH Act, and while the savings and preemption clauses in that Act contain differences from those contained in the OSH Act, we are persuaded that the same analysis should be applied here.
[8] We find inexplicable the failure of plaintiff and Komatsu to cite Gade in their briefs.
[9] ANSI's interpretation of its own standards is entitled to considerable deference. Geier, supra, 529 U.S. at 883, 120 S.Ct. at 1926, 146 L.Ed.2d at 933. By adopting ANSI's standards, we assume it was also the intent of the Secretary of Labor to have those standards mean the same thing which ANSI intended.