**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2155-22

DEBRA RUNOWICZ,

      Plaintiff-Appellant,

v.

STATE OF NEW JERSEY,
DIVISION OF STATE POLICE,
CAPTAIN WILLIAM HARKNESS
(#5355), LIEUTENANT ANTHONY
GUIDI (#5161), LIEUTENANT
COLONEL SCOTT EBNER (#5346),
MAJOR JOHN BALDOSARO
(#5027), CAPTAIN BRENDAN
MCINTYRE (#5079), CAPTAIN
JEANNE HENGEMUHLE (#5600),
SERGEANT FIRST CLASS
CHRISTOPHER POMMERENCKE
(#5391), and LIEUTENANT
RAYMOND PALOVCAK (#5387),

      Defendants-Respondents.

_____

Argued October 2, 2024 – Decided November 6, 2024

Before Judges Currier and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-2509-17.

George T. Daggett argued the cause for appellant.

Walter F. Kawalec, III, argued the cause for respondents (Marshall Dennehey, PC, attorneys; Walter F. Kawalec, III, and Leonard C. Leicht, on the brief).

PER CURIAM

In this action, arising out of plaintiff's allegations that defendants violated the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, in transferring her to different departments and delaying her promotion, plaintiff appeals from the orders granting defendants summary judgment and denying reconsideration. The court granted summary judgment to all defendants, finding the alleged acts of retaliation occurred outside the one-year statute of limitations.

Because we conclude there are disputed material facts regarding defendants' treatment of plaintiff and certain alleged acts of retaliation fell within the statute of limitations, we vacate and reverse the order granting summary judgment to all defendants, except defendant Sergeant First Class (SFC) Christopher Pommerencke. We affirm the portion of the order granting Pommerencke summary judgment.

2

I.

Plaintiff graduated from the State Police Academy on October 3, 1997. She was promoted to Sergeant in 2009. The following year, plaintiff was transferred to the Office of Professional Services (OPS) and later plaintiff became the Assistant Administrative Officer (AAO) of OPS, which was a supervisory role. In 2014, plaintiff became an SFC.

Though plaintiff's title was AAO/SFC, her duties were that of an Administrative Officer (AO), which is considered a Lieutenant position.[1] She explained she was not the AO because "position numbers" for AOs/lieutenants that were originally allocated to OPS were removed and used to promote individuals to AOs/lieutenants in other units.

On November 28, 2015, plaintiff states two civilian female employees told her they were being harassed by certain members of OPS. The employees repeated comments made by two male state troopers about another female employee's weight and eating habits. The troopers admitted making the comments. According to plaintiff, the female civilian employees were also told they could not eat in the OPS kitchen area at the same time the Intake Unit was

---

[1] Captain William Harkness explained the ranking system of the State Police is as follows, from highest ranking to lowest: Colonel, Lieutenant-Colonels, Majors, Captains, Lieutenants, Sergeants First Class, Sergeants, and Troopers.

in there, despite it being a common area available to everyone. Plaintiff testified she reported the incident to her direct supervisor, defendant Captain William Harkness.[2]

Plaintiff also testified about certain email exchanges she had with defendant Lieutenant Anthony Guidi in December 2015 which she described as "abusive." Plaintiff stated she believed Guidi responded as he did because she was a female. She said she was "treated like a secretary," someone that is "supposed to take orders and do my job." Plaintiff testified that she observed Guidi and other male members in his unit treat females differently than the male troopers, describing the treatment as condescending towards females. She informed Harkness about the emails.

According to plaintiff, she was told by Guidi and Captain Chris Nunziato not to have any contact with the Intake Unit moving forward, and that they had "closed the door." Plaintiff testified,

> [T]here were many instances where my job as the [AAO] with their unit specifically, and my job specifically with their unit pretty much stopped. I was not able to go into their office at all, correspond with them in any way.
>
> . . . .

---

[2] Harkness was a Lieutenant at the time.

. . . [I]t was pretty much unapproachable to go into that office in any way or correspond with them. So[,] I was advised by the captain to send my e-mails directly through him in reference to their unit.

Plaintiff described the "atmosphere in the office" as "frat boys where they just kind of hung out, joked, had fun . . . but the females within OPS were treated not with respect." If she went into the cafeteria when Intake Unit members were present, they would not speak to her.

On July 26, 2016, plaintiff submitted a complaint with the Attorney General's (AG) Office of Equal Employment (EEO), checking the boxes labeled "Sex/Gender" and "Differential Treatment"; referring to the December 2015 incidents, requesting mediation and stating she "would like for the unfair treatment to stop."[3] The AG's office informed plaintiff in October 2016 that it was beginning its investigation of the complaint.

Also in October 2016, defendant Captain Brendan McIntyre asked plaintiff if she was interested in transferring to the State Police Academy. Since plaintiff had earned the Lieutenant position in OPS, she asked whether that position was going to be returned to the unit. McIntyre said he would find out. According to plaintiff, she had earned her points needed for the Lieutenant

---

[3] This is the only information that can be seen on the complaint as the remainder of the document is redacted.

A-2155-22

position after having served in the OPS position for more than six years. The points would not apply to a promotion in another unit.

On November 3, 2016, defendant Major John Baldosaro asked plaintiff if she was interested in going to the Academy, to which plaintiff responded no. She again inquired into becoming a lieutenant in OPS and whether she could be a lieutenant in the Academy. Earlier that day, Baldosaro asked plaintiff to leave a meeting. Plaintiff did not know why she was told to leave as it had never happened before, and an AAO attended every meeting that the Major was in.

Plaintiff decided to speak with defendant Captain Jeanne Hengemuhle at the Academy about the potential move. During that conversation, Hengemuhle told plaintiff she was unaware of plaintiff's potential transfer to the Academy, and there was no AO position there. Hengemuhle informed plaintiff she was aware of plaintiff's EEO complaint. Plaintiff's request to speak with defendant Lieutenant Colonel Scott Ebner about the transfer was denied.

On November 15, 2016, plaintiff was transferred to the Academy. Plaintiff testified that the reason for her transfer—as it was presented to her— was that she was a female and "that [she] would be working under Jeanne Hengemuhle and she's a female and it would probably be a lot easier to be working under a female being . . . that [she is] a female." She also believed she

6

was transferred to the Academy because of the EEO investigation. Plaintiff testified she considered the transfer as retaliation on the part of Ebner, Baldosaro, and McIntyre because of her EEO complaint, since, in her experience, "nothing is confidential" in the OPS. She testified:

> Not that somebody specifically told me . . . that was the reason why I was being transferred, but based on not being able to sit in meetings anymore after that letter [regarding the investigation]was sent to me in the mail, not being directly in meetings with the major, being kicked out of meetings, not given work to do, yes, that to me was retaliation and the transfer was retaliation based upon my EEO complaint.

A male SFC officer replaced plaintiff at OPS as the AAO.

Immediately following the transfer, plaintiff filed a retaliation complaint against Ebner, Baldosaro, and McIntyre, which was investigated along with the EEO complaint.

While plaintiff was at the Academy, she stated she

> was not a part of any meetings whatsoever with the captain or the assistant. . . . [I] never sat in on any meetings, I never did any [AO] responsibilities, I was never given any. I just kind of sat there. There was a secretary that answered the phone[,] so I really had no responsibilities whatsoever given to me as the [AO] there, which is unheard of.

A-2155-22

According to plaintiff, Hengemuhle assigned administrative work, that should have been assigned to her, to the assistant head of the Training Support Unit and had closed door meetings with him.

Plaintiff testified the following created a hostile work environment for her while at the Academy:

> [N]ot having any work to do, not being assigned anything, not being able to approach the office for any work, not being a part of any meetings, dealing with a secretary that pretty much didn't talk all day long, had closed-door meetings with the captain and not myself involved. I was assigned her scheduling and she totally avoided me in reference to her scheduling whatsoever and would go to the captain every time for days off and this and that. So[,] she never really—me being her supervisor, she never even acknowledged that. Basically, again, like I said, not being given any work and knowing that [the assistant] [was] doing the admin[istrative] work that I should be doing.

According to plaintiff, when she asked why she was not being assigned work, Hengemuhle responded that everything was already arranged before plaintiff was transferred, and since plaintiff's position was not one created by the unit, Hengemuhle did not know what work to assign her.

In March 2017, Hengemuhle's assistant told plaintiff "this is not working out." Plaintiff was then transferred to the Training Support Unit with the title of assistant unit head. The existing male assistant unit head was moved to the

A-2155-22

Academy as the AAO.  The unit head was defendant Lieutenant Raymond Palovcak.  According to plaintiff,

> [she] was in charge of . . . five enlisted and one civilian as the assistant, but there was a unit head that was never there.  So[,] when [she] came over, [she] had [her] one and only meeting with the unit head and [the former assistant].  Both of them were very annoyed and pissed off that [the assistant] was leaving the unit.  And basically [plaintiff] was told . . . what [her] job responsibilities were, and that was the last time [she] pretty much had a meeting with [her] unit head and he was really never in the unit.  [She] think[s] [she] saw him maybe once or twice for a short amount of time.  So [she] got no training in [her] unit.

Plaintiff's responsibilities included providing computer support and testing for new recruits.

Immediately after this second transfer, Hengemuhle sent plaintiff an email asking her to set up a training for the Academy staff.  Plaintiff testified this request fell under the responsibilities of the new AAO at the Academy.  She considered it to be a retaliatory action because she was in a different unit.

In July 2017, plaintiff was transferred to the Management Review Unit.  According to plaintiff, prior to the transfer, Major James Parker informed her the transfer was being "held up" by Hengemuhle, who felt plaintiff did not deserve to be in a position that would lead to becoming a lieutenant.  Plaintiff testified that

9

> Parker tried to fight to get me there because the unit head there was retiring in the Management Review Unit, so there would have been a six-month time frame from July to when the retirement hit to when the job would be posted, which would give me my eight points [needed for the lieutenant promotion]. So basically [Hengemuhle] was doing everything in her power [to prevent] and delay the transfer.

Plaintiff also testified that Parker told her Hengemuhle said plaintiff was "not a team player, that [she was] a problem child, that [she] c[a]me to work and [did not] do anything."

According to plaintiff, she lost all the points she accumulated from being in OPS towards her promotion after she was transferred from the Academy to the Training Support Unit, and then to the Management Review Unit. She explained an individual must remain in a unit for at least six months to maintain the points. She testified, "I kept getting bounced around and not really having any stability anywhere to gain points. I went with seven-and-a-half-years in OPS [to] being transferred out to zero points."

Plaintiff was evaluated by Palovcak for the period of April 1, 2017 to June 30, 2017. She was found "satisfactory" in all areas but "cooperation" and "accepts direction," which were marked as "some improvement needed." She learned that one basis for the low mark arose from Hengemuhle's conversation with Palovcak about a mandatory training session plaintiff refused to attend.

Plaintiff formally responded to the evaluation, stating Palovcak and Hengemuhle lied in their comments about the training. Plaintiff said she never refused to go and in fact did attend the mandatory session as documented in emails. Plaintiff further testified that Palovcak was never in the office and did not train or supervise her. Therefore, he did not know what she did or did not do.

Plaintiff testified that all her prior evaluations as a state police officer were positive. The record included the 2015 performance evaluation for plaintiff while in OPS, which stated her job performance, proficiency, initiative, judgment/decision making, interpersonal relationships, communications, readiness for duty, effectiveness under stress, leadership, knowledge of rules, were all "Exceptional."

As a result of the evaluation, Major Mark Wondrack recommended plaintiff for a promotion to Lieutenant in April 2016, stating plaintiff "is a [hardworking], dedicated and trustworthy member of [OPS]." Ebner concurred with the evaluation, stating plaintiff "is an extremely competent, professional and dedicated worker who has excelled in her duties as [AO] for [OPS]."

The 2016 performance evaluation again stated plaintiff's performance was "Exceptional." Lieutenant Thomas Bonham recommended plaintiff for a promotion in January 2017.

On November 21, 2017, plaintiff filed her complaint in Superior Court against defendants, alleging they systematically discriminated against her, created a hostile work environment, and deprived her of a promotion to Lieutenant in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50; and retaliated against her for filing an EEO complaint in violation of CEPA, and for reporting violations of State Police rules and LAD regulations.

In December 2017, the AG sent plaintiff a letter stating: "After interviewing the relevant witnesses and reviewing the pertinent documents, the Office of EEO found [her complaint] to be unsubstantiated."

On May 2, 2018, plaintiff was promoted to Lieutenant, Unit Head of the Management Review Unit. In July 2018, the SFC who replaced plaintiff in OPS after she was transferred, was promoted to Lieutenant, AO of the OPS.

II.

On May 1, 2020, defendants filed a notice of motion for summary judgment, supported by several certifications. Ebner stated that the Deputy

Superintendent of Administration asked him to select three members to be transferred to the Training Bureau; that "[p]laintiff was the obvious choice . . . from OPS because she was a holdover from [the prior] administration as the de facto [AO]. It was traditional in the State Police that when a Major took over a Bureau, he (or she) could choose their own [AO]"; and that plaintiff had prior experience in the Academy and "Captain Hengemuhle . . . was willing to have" plaintiff.

Ebner submitted an additional certification stating he did not learn about plaintiff's EEO complaint and investigation until April 2017 when he was asked by the AG's office for a statement regarding plaintiff's November 2016 transfer.

Captain Harkness certified that plaintiff "resisted going through the chain of command" in the email exchange Guidi had with her, and Guidi's response was "completely appropriate." He stated:

> Plaintiff's issues with the chain of command were an ongoing pattern. She would insist that she could reach out directly to people below her rank, and tell them what to do, because she was their superior based strictly on her command, even if she was not in their chain of command. In [an] attempt to mentor her, I would talk to her and explain that she shouldn't jump the chain of command. She would honor the chain of command for a while and then go back to her old habits. We had multiple situations where she would reach out and direct people in another person's chain of command without any attempt to go through their superiors. To

13

ameliorate the problem, I requested that . . . [p]laintiff go through me or Captain Nunziato if she needed something from the Intake Unit. This was not done for discriminatory or retaliatory reasons, but because . . . [p]laintiff created friction by violating the chain of command, and I wanted to [e]nsure that the bureau was running smoothly.

Neither Lt. Guidi nor I ever received either an email or any other written communication indicating that as the [AAO], [p]laintiff was exempt from going through the chain of command.

Neither Lt. Guidi nor I was told verbally by a superior that [p]laintiff was allowed to bypass the chain of command when she sought resources or personnel not in her chain of command.

. . . .

There was never a general rule that the women in the office, including the civilians, could not send the people in the Intake unit [emails] or other communications or questions, nor did I or anyone else tell them that.

Harkness further certified that plaintiff's allegation of retaliatory conduct for being asked to leave meetings was "absurd," because others were also asked to leave during confidential conversations, including himself. He also stated his conversations with the female civilians "made it clear that no violation . . . occurred." He stated: "The women all indicated that they did not believe that

14

the alleged comments had been made because of their sex, and in any event that they were not offended."

Guidi provided a certification stating, "[t]here is nothing unusual about being transferred within the State Police" and he had "absolutely nothing to do" with plaintiff's transfer out of OPS. McIntyre executed a certification reiterating Guidi's comments and asserting Ebner made the determination regarding plaintiff's transfer. Baldosaro provided a certification stating it was not unusual to permit him to choose his own AAO, and that Ebner facilitated plaintiff's transfer.

Pommerencke provided a certification stating he had no knowledge as to why he was a defendant in this matter; he worked briefly with plaintiff in the Academy and he once contacted plaintiff "about possibly transferring assignments," but nothing came of it; and a decision to approve a transfer was beyond his control.

Hengemuhle certified that she considered plaintiff to be a friend; she did not request nor object to plaintiff's transfer to the Academy; plaintiff was unhappy with her commute to the Academy and preferred to be at the division headquarters; and she recalled plaintiff attempted to do a mutual transfer with Pommerencke but that to her knowledge an official request was not made.

Palovcak provided a certification stating plaintiff had advised him that the transfer was against her wishes, and her "two main goals" were to be transferred closer to home and promoted; there was nothing improper about plaintiff's training and she did not "take advantage of" training opportunities presented to her; his evaluation of plaintiff's performance was "fair and honest"; plaintiff became "angry" when she was told to undergo specific training and said she would not attend unless ordered; and plaintiff was happy about her transfer to Management Review Unit because the job was closer to her home.

Plaintiff opposed the motion in a statement of disputed material facts including: denying she was acting out of the chain of command when contacting members directly, as that was her job; denying that she got "loud" but rather it was defendants who yelled and screamed at her; stating communications were blown out of proportion because she was a woman; stating though some meetings were sensitive, she disagreed that she should be excluded; denying Ebner's reason for the transfer, asserting that Baldosaro had praised her work and there was no reason he would want a different AAO; and denying that her transfer was necessary since there was no work for her when she arrived at the Academy.

In August 2020, the court granted defendants' motion for summary judgment as to plaintiff's LAD claims but denied the motion as to her CEPA claims. In the accompanying opinion, the court found there appeared to be genuine issues of material facts as to whether plaintiff endured a hostile work environment, and that her LAD claims were waived because she presented CEPA claims grounded in the same protected action.

III.

In April 2022, defendants renewed their motion for summary judgment. In the supporting statement of material facts, defendants asserted the AG's Office of EEO found plaintiff's allegations in her EEO complaint were unsubstantiated. Defendants also informed the court of plaintiff's promotion and that the lieutenant position in OPS was filled on July 17, 2018, after plaintiff was promoted to Lieutenant in the Management Review Unit. The certifications from defendants previously attached to the first summary judgment motion were submitted again.

Harkness, Guidi, McIntyre, and Baldosaro asserted that the one-year statute of limitations under CEPA barred any claims against them because they had no interaction with plaintiff in the year before she filed her Superior Court complaint. As to Hengemuhle, Pommerencke, and Palovac, they contended that

17

since they only worked with plaintiff at the Academy following her transfer, they were not involved in the decision-making process regarding the transfer. Ebner asserted plaintiff had not presented any facts to counter the reasons he proffered for her transfer. Because there were non-retaliatory reasons for transferring plaintiff, defendants asserted plaintiff could not support her CEPA claim.

Plaintiff opposed the motion, asserting that the prior order denying summary judgment as to her CEPA claim was the law of the case. In addition, in its oral decision, the first court found there were issues of material fact regarding the presence of a hostile work environment. Plaintiff stated she responded to defendants' certifications and the statement of facts.

In its August 8, 2022 oral decision, the court found it was not precluded from considering the second summary judgment motion because the statute of limitations under CEPA had not previously been raised or adjudicated. The court stated that plaintiff did not submit a counterstatement of material facts stating the facts in dispute.

The court noted plaintiff filed her EEO complaint in July 2016 and she was transferred out of OPS in November 2016. Plaintiff filed her Superior Court complaint on November 21, 2017. Therefore, under the CEPA one-year statute

of limitations, she could only assert claims for alleged retaliatory actions that occurred within the year prior to November 21, 2017. The court found that Harkness, Guidi, McIntyre, and Baldosaro did not have any interaction with plaintiff during that one-year period. Therefore, the court granted summary judgment to those defendants.

In considering the allegations against Ebner, the court found he provided a "non-retaliatory business justification for the transfer[,]" stating: "[T]here's no genuine issue of material fact[] that ha[s] been raised in opposition to this motion as to there being anything inappropriate about the . . . reason articulated by Lieutenant Colonel Ebner for the transfer." The court similarly found plaintiff had not presented an issue of material fact as to Hengemuhle's interactions with her that could support a CEPA claim for retaliation.

The court entered a memorializing order that same day granting all defendants summary judgment.

Thereafter, plaintiff filed motions for reconsideration of the court's August 8, 2022 order and to vacate the order under Rules 4:49 or 4:50. Plaintiff's counsel asked for the opportunity to fully address the issues raised in the second summary judgment motion because he had not done so initially, as he assumed

the law of the case asserted in the first order denying summary judgment would prevail.

In its February 21, 2023 oral decision, the court found plaintiff had opposed the second motion for summary judgment and had addressed the issues raised in the motion. The court denied the motion for reconsideration, stating plaintiff did not "raise any issue that the [c]ourt did not consider." The court also denied the motion to vacate as plaintiff presented no meritorious grounds under which to support the motion. That same day, the court entered an order denying the motions for reconsideration and to vacate the summary judgment order.

IV.

On appeal, plaintiff contends the court erred in rejecting her "law of the case" argument and in denying her request to "reopen" the case to permit her to respond more completely to defendants' contentions in the summary judgment motion. Plaintiff also challenges the court's determination that the statute of limitations barred her CEPA claims as to all defendants.

We review a trial court's decision on a motion for summary judgment de novo, "applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022). A motion for summary judgment should be granted

when "there is no genuine issue as to any material fact challenged and . . . the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court should "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

## A.

We briefly discuss and dispose of plaintiff's argument that the "law of the case" doctrine prohibited the trial court from considering defendants' second summary judgment motion.

"The law of the case doctrine teaches us that a legal decision made in a particular matter 'should be respected by all other lower or equal courts during the pendency of that case.'" Lombardi v. Masso, 207 N.J. 517, 538 (2011) (quoting Lanzet v. Greenberg, 126 N.J. 168, 192 (1991)). "Importantly, the law

21

of the case doctrine is only triggered when one court is faced with a ruling on the merits by a different and co-equal court on an identical issue." Id. at 539.

However, we have also recognized that "an order denying summary judgment is not subject to the law of the case doctrine because it decides nothing and merely reserves issues for future disposition." Cadre v. Proassurance Cas. Co., 468 N.J. Super. 246, 259 (App. Div. 2021) (quoting Gonzalez v. Ideal Tile Importing Co., 371 N.J. Super. 349, 356 (App. Div. 2004)). "Denial of summary judgment preserves rather than resolves issues; therefore, later reconsideration of matters implicated in the motion, including the reasons in support of the denial, are not precluded." Ibid. (quoting Blunt v. Klapproth, 309 N.J. Super. 493, 504 (App. Div. 1998)).

Under Rule 4:42-2(b),

> [A]ny order or form of decision which adjudicates fewer than all the claims as to all the parties shall not terminate the action as to any of the claims, and it shall be subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of justice.

The court's August 7, 2020 order denied in part and granted in part defendants' motion for summary judgment. Therefore, this was an interlocutory order "because [it] did not resolve, either individually or collectively, all issues as to all parties." Gonzalez, 371 N.J. Super. at 355. Accordingly, it was not an

abuse of discretion for the court to consider defendants' second summary judgment motion. Furthermore, the first court did not find that plaintiff established a CEPA claim. The August 2020 order stated: "After taking into account all the papers and arguments from both sides it appears that there are genuine issues of material fact as to whether plaintiff endured a hostile work environment."

## B.

We turn then to the court's order granting summary judgment to all defendants as barred under the applicable statute of limitations.

"[CEPA] protects workers who blow the whistle on their employers' illegal, fraudulent, or otherwise improper activities that implicate the health, safety, and welfare of the public." D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 114 (2007). The statute "is remedial social legislation designed to promote two complementary public purposes: 'to protect and [thereby] encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Id. at 119 (alteration in original) (quoting Yurick v. State, 184 N.J. 70, 77 (2005)). Because CEPA is a remedial statute, it "should be construed liberally

to effectuate its important social goal." Chiofalo v. State, 238 N.J. 527, 540 (2019) (quoting Battaglia v. UPS, 214 N.J. 518, 555 (2013)).

CEPA protects against retaliatory action taken by an employer against an employee. "CEPA defines actionable retaliation as 'the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment.'" Green v. Jersey City Bd. of Educ., 177 N.J. 434, 446 (2003) (quoting N.J.S.A. 34:19-2(e)). N.J.S.A. 34:19-5 states: "Upon a violation of any of the provisions of this act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction."

Our Supreme Court has held that the CEPA one-year statute of limitations "begins to run from the final act of retaliation when there is a continued course of retaliatory conduct by the employer." Green, 177 N.J. at 437-38. In Green, the plaintiff was a teacher who refused to participate in what she considered to be a fraudulent scheme and reported the scheme to a supervisor. Id. at 438-39. The plaintiff claimed she was retaliated against for the following two years by conduct that included denied requests for training or to participate in programs, substandard evaluations despite previous evaluations being consistently satisfactory, being moved to a dilapidated and inadequate classroom, and her

A-2155-22

students also being denied access to programs or permitted to go on field trips. Id. at 439.

The Court found

> "[r]etaliation," as defined by CEPA, need not be a single discrete action. Indeed, "adverse employment action taken against an employee in the terms and conditions of employment," N.J.S.A. 34:19-2(e), can include, as it did in this case, many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct.
>
> [Id. at 448.]

The Court found that even though the plaintiff reported what she believed was illegal conduct in 1995, the treatment she received continued until she retired in 1997, and, therefore, her CEPA claim filed in May 1997 was not barred. Ibid.

Here, plaintiff filed an EEO complaint on September 20, 2016, regarding the unfair and differential treatment of females in OPS. She reported her complaints to Harkness, her superior officer. Two weeks later, McIntyre and Baldosaro discussed with plaintiff a transfer to the Academy. On November 15, 2016, plaintiff was notified that she was going to be transferred to the Academy against her wishes; she was physically transferred ten days later. On November

18, 2016, plaintiff filed a retaliation complaint with the EEO against Ebner, Baldosaro, and McIntyre.

Plaintiff filed her complaint in Superior Court on November 21, 2017. She alleged she was retaliated against for having filed an EEO complaint and retaliation complaint with EEO, and that she was "transferred several times thereby being deprived of promotion to Lieutenant and . . . subject[ed] to a hostile work environment."

All of the events giving rise to plaintiff's allegations occurred within the one year before the filing of her complaint. Plaintiff has presented facts regarding Harkness, Ebner, Baldosaro, and McIntyre's actions leading to her transfer. Plaintiff alleges the remaining defendants continued their mistreatment of her and retaliated against her while she was at the Academy, resulting in another transfer. Those allegations clearly fall within the year period before the filing of her complaint. From the time plaintiff filed her EEO complaint, there was a continuing course of retaliatory conduct. Therefore, the court erred in granting defendants summary judgment on statute of limitations grounds.

C.

We address then whether plaintiff has presented a prima facie case to withstand summary judgment on her CEPA claim. Although we have stated the

August 2020 order denying summary judgment was not binding on the second court considering the application, nevertheless, the facts and documents presented in both motions were the same—plaintiff's deposition testimony, and defendants' certifications prepared to support the motions.

A cause of action pursuant to CEPA requires the following proofs:

> (1) [the employee] reasonably believed that [their] employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) [the employee] performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against [them]; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Battaglia, 214 N.J. at 556 (2013) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

We are satisfied, after a careful review of the evidence, that the record contains disputed facts as to the reasons behind plaintiff's transfers, and as to why she was not promoted while in OPS. Some certifications portray plaintiff as unlikeable, sensitive, and a person who "stirs" things up. Parker certified plaintiff "rubbed" people the wrong way. He believed she was not being promoted for personal reasons.

The 2015 and 2016 evaluations described plaintiff as exceptional in her work, and she was recommended for promotion to Lieutenant by two supervisors

27

before her transfer out of OPS. However, she was not promoted despite being in the unit for more than seven years. The male AAO who replaced her in OPS was promoted to Lieutenant within two years of his arrival there.

When viewed in the light most favorable to plaintiff, there are disputed material facts in the record regarding defendants' treatment of plaintiff and whether the treatment, including the transfers and failure to promote were related to the EEO and retaliation complaints. Therefore, we vacate the summary judgment order as to all defendants except for Pommerencke, as a review of the evidence reflects plaintiff has not demonstrated a prima facie case of a CEPA violation against Pommerencke.

The August 8, 2022 order is vacated except for defendant Pommerencke. We remand for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION