46 A.3d 575

ASDAL BUILDERS, LLC, ASDAL RENOVATIONS, LLC, AND WILLIAM ASDAL, INDIVIDUALLY, PETITIONERS–APPELLANTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, LAND USE REGULATION, RESPONDENT–RESPONDENT.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, COASTAL AND LAND USE COMPLIANCE AND ENFORCEMENT, PETITIONER–RESPONDENT, v. ASDAL BUILDERS, LLC, ASDAL RENOVATIONS, LLC, AND WILLIAM ASDAL, INDIVIDUALLY, RESPONDENTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Submitted March 28, 2012—Decided June 25, 2012.

Before Judges CUFF, LIHOTZ and ST. JOHN.

*Sokol, Behot & Fiorenzo,* attorneys for appellants (*Neil Yoskin,* on the briefs).

*Jeffrey S. Chiesa,* Attorney General, attorney for respondent (*Melissa H. Raksa,* Assistant Attorney General, of counsel; *Daniel A. Greenhouse* and *Jason T. Stypinski,* Deputy Attorneys General, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

We examine challenges by appellants Asdal Builders, LLC (Builders), Asdal Renovations, LLC (Renovations), and William Asdal seeking to reverse the final decision of the Commissioner of the Department of Environmental Protection (DEP), regarding the renovation and construction of structures located in a floodway. Appellants portray the DEP's enforcement of various flood hazard and freshwater protection rules as arbitrary and capricious actions, quelling the restoration of civil war era structures which maintained their historic character while incorporating modern "green" technology.

The Commissioner's decision encompassed two matters consolidated by the agency. In the first, the Commissioner rejected the

recommendation of the Administrative Law Judge (ALJ) and declined to grant Builders' application for a stream encroachment permit (SEP) nunc pro tunc or, alternatively, legalize renovations made to the property thereby relieving Builders from strict compliance with the regulations by granting a hardship waiver (the permit case). In the second, the Commissioner denied Builders' and Asdal's request to abate or reduce penalties imposed for environmental regulatory violations resulting from the development of the property (the penalty case).

On appeal, Builders argues the Commissioner's decision in the permit case arbitrarily disregarded findings and conclusions of the ALJ and misapplied the law. Asdal and Renovations contend the assessments imposed in the penalty case were excessive, unreasonable and unwarranted.

Following our review of the arguments advanced on appeal in light of the record and applicable law, we conclude the Commissioner's denial of the nunc pro tunc SEP application was incorrectly grounded on a determination that the property was abandoned and therefore, the Commissioner erroneously applied applicable regulations. In the penalty case, we conclude certain penalties must be modified and the personal assessment against Asdal must be vacated. Accordingly, we affirm in part, reverse in part, and remand the matter to the Commissioner for additional proceedings.

I.

A.

Asdal and his wife, as the sole shareholders of Renovations, purchased over twenty-four acres, split almost equally between Lot 2, Block 42 in Lebanon Township, Hunterdon County, and Lot 17, Block 55 in Washington Township, Morris County (the property). The South Branch of the Raritan River wraps around two

sides of the property and a manmade "millrace" [1] transects the parcel. While all the structures on the property are located within Lebanon Township, the entire property lies within the floodway of the South Branch of the Raritan River and is designated as a flood hazard area.

The property was once operated as the Lawrence Trimmer Millworks and had served as a working farm "perhaps as far back as two centuries to the original homestead in 1732." The DEP's Historic Preservation Office (HPO) lists the property among the sites on the State Register of Historic Places.[2] It is not disputed that farming activities on the property ceased by 2000, when the farmland assessment was lost. In fact, at the time Renovations purchased the property, the buildings were in disrepair and the property was littered with debris and solid waste, including: "1,200 yards of debris, 4,000 yards of wood debris, and another 100 yards of garbage, including 14 tons of tires." [3]

Shortly after its purchase, Renovations removed the debris and engaged a farmer to re-establish the farm lands as historically operated. The farmer mowed the existing natural vegetation, then planted and cultivated orchard grass and hay on each side of the millrace.

Builders, which is also solely owned by Asdal and his wife, undertook the restoration of the structures erected on the proper-

---

[1] A millrace or raceway is a manmade channel typically supplying water for mills or manufacturing. *Trenton Water Power Co. v. Donnelly*, 77 *N.J.L.* 659, 659–60, 73 A. 597 (E. & A.1909).

[2] The HPO maintains an inventory of historic and cultural resources eligible for listing on the State and National Registers of Historic Places. The property is included in the 2008 Technical Report. N.J. Highlands Water Prot. & Planning Council, *Historic, Cultural, Scenic, Recreation, and Tourism: 2008 Technical Report*, 33 (Nov. 7, 2007), http://www.highlands.state.nj.us/njhighlands/master/tr_historic_cultural_scenic.pdf.

[3] We note Builders' submission also informed the DEP that it removed "hundreds of yards of scrap metal appliances, hundreds of yards of stumps, in addition to an [A]irsteam trailer and several old car frames."

ty. As renovated, the property's main building is now known as the Raritan Inn, a zero-energy bed and breakfast, which

> represents the first pre-existing, single-family residence that used a Civil War shell and achieved zero energy ... through a combination of geothermal heating and cooling, insulation and insulating components, and solar panels. The house relies upon no fossil fuels for heat and uses bottled propane only in the kitchen.

A smaller residential cottage, a barn, and a woodshed were also restored. Other buildings, including a chicken coop, garage, and barn were removed. Finally, a new garage was constructed in a different location from the one razed, and a stone retaining wall was created using foundation stones from the removed structures.

Prior to the commencement of work, Builders engaged Stephen Parker, a professional engineer associated with Parker Engineering & Surveying, PC, to assist in obtaining local and county approvals for the proposed renovations. Parker, on behalf of Builders, applied to the DEP for a Stream Encroachment Jurisdiction Determination (SEJD) in order to replace the property's septic system. In the May 29, 2003 SEJD, the DEP advised "a Stream Encroachment Permit was not required" based on the drawings submitted to the DEP for review, which showed "[t]he proposed system will not require the placement of any fill above the existing grades." [4]

Beginning in 2002, Lebanon Township issued construction permits for the renovation of the main residence, the adjacent cottage, and construction of the relocated garage. In a January 18, 2005 resolution, the Township approved the development, finding it complied with Lebanon Township's Flood Damage Prevention Ordinance, which required approval and issuance of a variance

---

[4] We note the flood hazard regulations were significantly modified in 2007. 39 *N.J.R.* 4573(a) (Nov. 5, 2007). All regulatory sections cited in this opinion refer to the regulations which govern Builders' permit request, that is those effective March 20, 1995, through November 5, 2007. 27 *N.J.R.* 1245–64 (Mar. 20, 1995).

Under the prior regulations "fill" refers to "material placed or deposited within the flood plain or the watercourses that create them[,] which will displace floodwaters." *N.J.A.C.* 7:15–1.2.

prior to the commencement of construction or development. The resolution stated Builders had

demonstrated good and sufficient cause for the grant of the variance, and ha[d] shown that failure to grant the variance would result in exceptional hardship. Also, granting the variance will not result in increased flood heights or threats to public safety ... [or cause] any increase in flood levels during the occurrence of the base flood discharge.

In September 2005, the Township issued certificates of occupancy for the two residential structures and a certificate of approval for the garage.

B.

On May 4, 2004, in response to a complaint regarding "development in the floodway," the DEP inspected the property, resulting in a notice of violation (NOV) of provisions of the Flood Hazard Area Control Act (FHACA), *N.J.S.A.* 58:16A–50 to –68. The NOV, dated May 24, 2004, advised Builders that permit approval was required prior to construction of the garage and additions to the main house, because they caused "disturbance of approximately 1,176.5 square feet" of the floodway. The NOV also instructed remedial steps must be taken within thirty days, including applying for a SEP and submitting a restoration plan.

Parker, on behalf of Builders, applied for an· "after-the-fact" SEP, seeking approval of the development within the floodway, or, alternatively seeking a hardship waiver of the strict enforcement of the flood regulations. Parker's letter outlined the benefits provided by Builders' activities on the property, maintaining the redevelopment "resulted in a significant improvement to the stream[']s flood carrying capacity, and an overall improvement to the site and surrounding areas." Appellants' submission suggested "[t]he net result of the activity ... [was] an overall reduction in fill and obstruction to stream flow within the floodway, increased improvements in structural integrity of the structures, and restoration of a historically significant property." Further, although the original garage was destroyed, the new garage was built in compliance with the building code; anchored to prevent flotation,

collapse, or lateral movement; built with flow-through openings; and located in the "shadow" of the cottage, thus "eliminating a significant obstruction to the direction of flow of the flood waters." Finally, appellants noted approval of the new stone retaining wall was sought in an amendment to the application, as DEP had requested.

On August 12, 2004, the SEP application was returned for deficiencies. The DEP issued a second NOV on October 19, 2004, adding additional violations of the FHACA regulations.[5] Parker transmitted more material regarding the development to the DEP. However, a December 22, 2004 letter from the DEP rejected the SEP request because the "application d[id] not satisfy the requirements of the Rules." The violations were described as:

> The applicant has conducted a number of activities on this site without first obtaining a [SEP]. These include the enclosure of the rear porch of the smaller of the two dwellings, the construction of a porch and a patio for the larger dwelling, the construction of an 816 square foot frame garage, and the construction of a stone wall and driveway surrounding a portion of the perimeter of the entrance driveway located in between the two dwellings. Also, a 100 square foot shed and a 1,350 square foot L-shaped garage were removed from the site. Whereas the two dwellings, barn and shed are pre-existing, the 816 square foot frame garage is a new structure. Also, in addition to this, a field inspection of the site showed that the septic field was built above existing grades, which is in violation of a Jurisdictional Determination letter issued by the [DEP 6].
>
> Since the above referenced construction activities involved the placement of fill and structures within the floodway, this application is not in compliance with [the FHACA Rules].

On September 26, 2005, a DEP inspection of the site prompted the issuance of a third NOV based on the New Jersey Freshwater Wetlands Protection Act (FWPA), *N.J.S.A.* 13:9B–1 to –30. The NOV cited the disturbance of vegetation within the freshwater wetlands, stating:

> Vegetation was observed to have been removed from approximately 12,500 square feet of land within 50' from the top of the bank along the South Branch [of the]

---

[5] This NOV is not contained in the record.

[6] Contrary to the plans Parker submitted to support the SEJD, the septic system "was constructed nine inches higher" than grade.

Raritan River, and from approximately 33,750 square feet of land within 50' from the top of the bank along the raceway. Also, approximately 13,725 square feet of vegetation was observed to have been removed from within exceptional resource value freshwater wetlands and transition areas.

Builders was informed of the necessity to complete corrective measures and warned of the possible imposition of fines. In addition to these vegetation disturbances, the enumerated violations were delineated as:

1. The construction of an approximately 120.5 square foot addition to the cottage within the floodway;

. . . .

2. The construction of an approximately 1,056 square foot garage within the floodway;

. . . .

3. The placement of fill material within the floodway in connection with the construction of a 120 foot retaining wall, patio and gravel drive associated with the main house;

. . . .

4. The placement of fill material within the floodway in connection with the construction of a raised-bed subsurface sewage disposal system[;]

. . . .

5. Re-grading around the cottage within the floodway;

6. The enlargement of the back porch on the main house within the floodway;

7. The removal of vegetation within 50' from the top of the bank along the raceway;

8. Disturbances at and below the top of the bank associated with the raceway in connection with the construction of a storm water outfall structure from the parking area to the raceway;

9. The placement of fill material below the top of the bank along the raceway in connection [with the] construction of stone abutments below the top of the banks along the . . . raceway; and

10. Failure to properly anchor [a] propane tank associated with the main house.

On June 16, 2006, the DEP recorded its notice of the wetlands violations as an encumbrance to the property's deed.

Builders appealed the denial of the SEP application. Following an unsuccessful arbitration session, the case was transferred to the Office of Administrative Law (OAL).

## C.

On August 28, 2007, while the permit case was pending, the DEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment (AONOCAPA) imposing a $66,000 penalty against Asdal and Builders. The AONOCAPA ordered "all regulated activities on the site" to cease immediately and required all disturbed areas to be stabilized. Because the South Branch of the Raritan River qualified as an exceptional resource, specifically, "a trout production, Category–1 watercourse[,]" Builders was instructed to remediate the disturbances caused when it replaced native vegetation with a lawn and hayfield. The DEP assessed $6,000 for each of the eleven FWPA violations it noted. Further, Builders was required to submit a "restoration plan" outlining "a list of all indigenous plant species ... intended to replace those removed" and a time schedule for implementation and completion of the restoration work.

On May 26, 2009, nearly two years after the first AONOCAPA, the DEP issued an amended AONOCAPA against Asdal and Builders, citing FWPA violations resulting from the disturbance of 2.9 acres of the wetlands transitional area surrounding the millrace (the planted hayfield). The amended AONOCAPA also imposed penalties of $100,000 for continuing FHACA violations as appellants had not modified the structure pending the OAL hearing, and $75,000 for the FWPA violations observed during a recent inspection. It is noted that a portion of these assessments were imposed pursuant to the DEP's authority designated in the newly enacted Environmental Enforcement Enhancement Act (EEEA), L. 2007, c. 246.[7]

Builders and Asdal challenged the imposition of these penalties and requested a hearing. The penalty case was transferred to the

---

[7] Prior to the enactment of the EEEA, the DEP was required to pursue an injunction and penalties through an action filed in Superior Court. N.J.S.A. 58:16A–63(a) (2004).

OAL. At appellants' request, the permit case and the penalty case were consolidated prior to the hearing.

## D.

In proceedings before the OAL, the ALJ issued partial summary disposition in favor of the DEP. The ALJ concluded the property lost the benefit of a grandfathered wetlands farming exemption to the FWPA regulations because farming had been ceased for more than five years.

During the two-day plenary hearing, Asdal testified regarding each stage of construction. He admitted he knew the property was in a flood plain, which was why he "flood proofed"[8] the renovated cottage and the new garage and changed the garage's location on the property. Further, he agreed the existing footprint of the main structure was slightly expanded by the enclosed porch; and a low stone wall and a garage were constructed. However, Asdal had not recognized the need for an SEP permit and challenged the DEP's claim that fill was added to the property. He asserted extensive debris and structures were removed, so the net effect was less fill on the property than there had been before construction.

Asdal also asserted the penalties were excessive, explaining the Raritan Inn does not make a profit and is sustainable only because farming activities result in a decreased realty tax assessment. Asdal acknowledged a portion of the property's vegetation was mowed to allow access to various areas, but it was not to destroy natural flora. Also, he noted the initial NOV cited disturbance of 225 square feet of wetlands, which had since regenerated negating any violation. Finally, Asdal questioned the accuracy of the

---

[8] See N.J.A.C. 7:13–1.2 (defining "flood proofing" as "any combination of structural and nonstructural design features, additions, changes, or adjustments to structures which reduce or eliminate flood damage to real estate or improved real property, structures and their contents").

amended AONOCAPA, which expanded the scope of violations to the wetlands transition area now farmed as hayfields.

Parker also testified. He acknowledged the septic system when measured was constructed above grade, contrary to the design approved in the SEJD, but explained this resulted because the angle of the effluent cleansing equipment needed to be seeded slightly higher than expected. In any event, he opined the depth remained within construction tolerance.

Parker claimed the overall disturbance presented by Builders' efforts was minimal. He reiterated the volume of fill removed from the property and advised some existing fill was actually reused in other areas, so overall a very small net increase in fill occurred. He characterized the change as insignificant and permissible under the rules.

On behalf of DEP, Peter DeMeo, a supervising engineer, stated Builders' SEP request was denied after the agency concluded the property's buildings were "abandoned," thus disqualifying any development as renovation of a pre-existing use. Also, despite the fact that the newly constructed garage was stabilized and flood proofed, DeMeo maintained it was noncompliant because its floor was 1.6 feet below the regulatory flood elevation. DEP considered the garage habitable space and noted in the event of flooding the noncompliant floor could result in damage to personalty stored in the garage.

DeMeo stated the septic bed was "mounded" rather than built to grade, contrary to the SEJD approved design. However, on cross-examination, he agreed he did not personally make that observation.

DeMeo also discussed the DEP's rejection of Builders' SEP application, stating it attempted to utilize a "net fill" calculation. He explained the DEP only permitted net fill calculations when measuring fill in "the flood fringe where floodwaters are stored and not in the floodway where floodwaters need to be conveyed." Finally, the DEP viewed Builders' clean-up efforts as a "correc-

tion" not an "improvement," for which no exception or credit applied.

David Sumba, a senior environmental specialist, testified regarding DEP's determination of the wetlands disturbances, which he explained were actually estimates derived from the differences in the appearance of aerial photographs taken between 2002 and 2007 that were compared using specialized computer software. He noted the majority of the hayfield fell outside of the area of DEP's jurisdiction, but concluded, based on computer calculations, rather than visual observations, there was encroachment within the fifty-foot riparian buffer.

Finally, Armand Perez, a DEP principal environmental specialist, testified regarding his inspections and the computation of the penalties. He also related the basis for imposing an individual assessment against Asdal; namely, his ownership of Builders and Renovations and the DEP's prior interactions with Asdal.

On May 17, 2010, the ALJ issued a lengthy initial decision. The ALJ reviewed each violation cited by the DEP. In viewing the totality of the development, the ALJ considered the total fill impact resulting from the activities on the property. She found the result "insignificant," and concluded the DEP's denial of the SEP to renovate and expand an existing use was arbitrary and capricious.

Regarding the penalty case, the ALJ rejected application of the EEEA's enhanced penalties as "all of [appellants'] actions . . . under the FHACA pre-dated the EEEA[,]" even if the violation continued after the EEEA's effective date. She recommended dismissal of the $100,000 enhanced penalty for FHACA violations, and after accounting for the "variance of the FWPA allegations over the course of [the] NOVs and AONOCAPAs; . . . the historic importance of the structures and agricultural property and mill-race, . . . [and] the lack of pecuniary benefit or profit from the Inn or the farming[,]" the ALJ reduced the penalty assessment for the transitional FWPA violations to $50,000, comprising $10,000 per year of improper farming activities. Renovations was ordered to

"reduce the size of its cultivated fields over the course of the next three growing seasons" to conform to the boundaries of the wetland transition areas and to "plant natural wetland transition area vegetation within that area."

Finally, the ALJ found Asdal did not knowingly violate the FHACA or the FWPA, and did not intentionally overlook the jurisdictional interests of the DEP. Rather, Asdal undertook the renovation project "for historical and renewable-energy purposes[,]" which had "public benefits." He obtained numerous permits and held "a good-faith belief that the property had a historic exemption for farming[.]" Therefore, the ALJ concluded the imposition of individual liability for the assessments was inappropriate.

The DEP filed exceptions to the ALJ's initial decision. The matter was transferred to the Commissioner for review.

### E.

On December 9, 2010, the Commissioner issued his extensive decision, modifying some of the ALJ's factual findings and rejecting most of her conclusions. The Commissioner found Builders' request for an after-the-fact SEP did not seek to expand a pre-existing use because the structures were "abandoned." The Commissioner determined Builders should have "sought [a permit] for the restoration of the dilapidated and uninhabitable structures in the floodway" before any activities commenced, and "those activities [could not] be approved through a proceeding at the OAL [seeking] to challenge the denial of the application submitted." Further, the Commissioner noted the retaining wall, driveway, and garage were new structures that increased the prohibited fill in the floodway. He also rejected the ALJ's finding that these obstructions were insignificant. Moreover, the Commissioner reinforced DEP's rejection of the net fill concept for development in floodways. Based on these findings, he concluded the SEP was properly denied.

Rejecting Builders' alternative claim of hardship, the Commissioner concluded the difficulties were self-created because

Asdal had feasible and prudent alternatives, i.e., not purchasing the [p]roperty, not expanding the structures, and not building new structures. Asdal did not prove extraordinary or exceptional circumstances [ ]or undue cost of strict compliance. Asdal offered no evidence, outside of the rejected net fill argument, which satisfies the criteria that the development will not substantially impair the appropriate use or development of adjacent property and will not pose a threat to the environment or public health, safety and general welfare.

Finally, the Commissioner reinstated the cessation order, partially reinstated $166,000 of the assessed penalties, and applied the corporate officer doctrine to reinstate individual liability against Asdal. This appeal followed.

＊　＊　＊　＊　＊　＊　＊　＊

**At the direction of the court, the discussion of issues raised on appeal in sections II and III has been omitted from the published version of the opinion. *R.* 1:36–2(a).**

＊　＊　＊　＊　＊　＊　＊　＊

## IV.

Appellants also challenge the penalties assessed by the DEP and reinstated by the Commissioner. First, Asdal argues he has no individual liability. Second, Builders' maintains no penalties may be imposed under the EEEA. We examine these issues.

## A.

Asdal seeks reversal of the Commissioner's imposition of individual liability for the FHACA and FWPA violations as a "responsible corporate officer" because of the reinstitution of farming activities within freshwater wetlands. Because the Commissioner misapplied the law, we agree.

The Commissioner erred in concluding "both before and after the [January 4,] 2008 amendments ... both acts define a 'person' to include 'corporate officers.'" This is an incorrect statement of the law.

Prior to the 2008 amendments, the FHACA regulations stated: "[a]ny person who violates a provision of this chapter shall be subject to penalty and injunctive relief, as applicable, pursuant to *N.J.S.A.* 58:16A–63 and 58:10A–1 et seq." *N.J.A.C.* 7:13–5.4. The definition of "person" did not include "a responsible corporate official." *N.J.A.C.* 7:13–1.2; *N.J.S.A.* 58:16A–51 (2004). The regulation added the term "responsible officer" on October 2, 2006. 38 *N.J.R.* 3950(a) (Oct. 2, 2006). Similarly, under the FWPA, a "person" is defined without reference to a responsible corporate officer, *N.J.S.A.* 13:9B–3, and no separate provision imposes liability for a corporation's activities on its officers.

The Commissioner's reliance on *N.J. Dep't of Envtl. Prot. v. Standard Tank Cleaning Corp.*, 284 *N.J.Super.* 381, 402–03, 665 *A.*2d 753 (App.Div.1995), is misplaced. In that matter we addressed the responsible corporate officer doctrine in the context of environmental penalties under *N.J.S.A.* 58:10A–3($l$) of the Water Pollution Control Act, *N.J.S.A.* 58:10A–1 to –43, which included "any responsible corporate official" in the definition of "person[.]" *Id.* at 401, 665 *A.*2d 753.

Since the statute did not impose individual liability on responsible corporate officers, we must vacate the Commissioner's individual assessment of penalties, as set forth in the August 28, 2007, and May 26, 2009 AONOCAPAs, for violations prior to October 2, 2006, predicated solely on Asdal's ownership of Builders and his supervision of its activities.

B.

Builders' next point argues the penalties assessed were arbitrary and capricious, noting the initial NOV was served on May 24, 2004, but an AONOCAPA was not issued for disturbing 45,000 square feet of wetlands until August 28, 2007. Two years later a second AONOCAPA was imposed. Both AONOCAPAs were issued after Builders appealed the denial of the SEP. Builders further objects to the assessments related to violations in 2004, prior to the enactment of the EEEA, with its enhanced penalties.

The DEP argues the FWPA and FHACA violations are ongoing, making penalties under the EEEA appropriate because the assessments relate to continuing violations occurring after enactment of the EEEA.

In 2004, the DEP held the authority to pursue imposition of penalties for violations of the FWPA and FHACA, but only by filing an action in Superior Court. *N.J.S.A.* 58:16A–63 (2004) (allowing penalties for violations of FHACA); *N.J.S.A.* 13:9B–21 (2004) (allowing penalties for violations of FWPA). Also, the amount of recoverable penalties was restricted as follows:

(a) Any person who knowingly violates a provision of this act or a rule, regulation or order adopted pursuant to this act shall be subject to a penalty of not more than $2,500.00 for each offense and any person who otherwise violates a provision of this act shall be subject to a penalty of not more than $1,500.00 for each offense[.] [*N.J.S.A.* 58:16A–63(a) (2004).]

*See also N.J.A.C.* 7:13–19.1(a)2 ("Any person who otherwise violates any provision of the Act or this chapter shall be subject to a penalty of not more than $1,500 for each offense."). The maximum penalties were reserved for those who knowingly violated the statutes. *See N.J.S.A.* 58:16A–63(a) (2004) (allowing higher penalty for knowing violations of the Act or regulations); *N.J.A.C.* 7:13–19.1(a)1 ("Any person who knowingly violates any provision of the Act or this chapter shall be subject to a penalty of not more than $2,500 for each offense[.]").

The enactment of the EEEA eased the penalty assessment procedure by granting the agency direct authority to impose assessments without having to resort to the Superior Court. *N.J.S.A.* 58:16A–63 (2008). The EEEA also enhanced penalties for violations of the FHACA from $2500 to $25,000 per day. *Ibid.* In this matter, penalties were assessed under the EEEA for four days.

■ "When considering whether a statute should be applied prospectively or retroactively, our quest is to ascertain the intention of the Legislature. In the absence of an express declaration to the contrary, that search may lead to the conclusion that a statute should be given only prospective effect." *N.J. Dept. of*

*Envtl. Prot. v. Ventron Corp.*, 94 *N.J.* 473, 498, 468 *A.*2d 150 (1983).

■ We reject the Commissioner's conclusion that new enhanced penalties may be assessed under the EEEA for "ongoing violations" related to the renovation of the pre-existing structures on the property which concluded in 2004. Unlike ongoing pollution violations, the violations claimed here are because the renovated structures remain on the property. Appellants challenged the DEP's conclusions and, rightly, were entitled to a determination before being forced to remove the renovated structures. The "continuing violations" under the FHACA merely result because the buildings still exist.

The efficacy of any enhanced penalties for FHACA based on the 2004 construction activity is rejected as the EEEA may not be applied to pre-existing violations.[9]

■ The ALJ found, and DEP did not contest, that Builders' did not knowingly commit the offenses. Typically, the highest penalties are reserved for knowing violations. See *N.J.S.A.* 58:16A–63(a) (allowing higher penalties for knowing violations of the FHACA or the flood rules). Absent such conduct the maximum assessments should be inapplicable.

We conclude the Commissioner failed to properly weigh the credibility determinations made by the ALJ when he rejected her findings regarding the assessments. Therefore, his conclusions must be vacated and the matter remanded for further review.

On remand, the Commissioner must review those findings and conclusions we have discussed in our opinion prior to finalization of applicable penalties.

---

[9] The continued wetlands disturbances resulting from current activities may be sustained. *N.J.S.A.* 13:9B–21.

## V.

In summary, we reverse and remand this matter to the Commissioner for further consideration in light of our opinion.

\*    \*    \*    \*    \*    \*    \*    \*

At the direction of the court, the discussion of issues raised on appeal in the remainder of section V has been omitted from the published version of the opinion. *R.* 1:36–2(a).

\*    \*    \*    \*    \*    \*    \*    \*

Affirmed in part, reversed in part, and remanded for additional proceedings consistent with this opinion. We do not retain jurisdiction.