**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1414-17T3
                    A-1616-17T3

STATE OF NEW JERSEY,
DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

      Plaintiff-Respondent,

v.

CENTENNIAL LAND &
DEVELOPMENT CORPORATION,
and DEVEL, LLC,

      Defendants-Respondents/
      Cross-Appellants,

and

STEPHEN D. SAMOST,

      Defendant-Appellant/
      Cross-Respondent,

and

TOWNSHIP OF MEDFORD, COUNTY
OF BURLINGTON, CENTENNIAL
PINES CLUB, and ESTATE OF

JOSEPH SAMOST,[1]

      Defendants-Respondents.

_____

STATE OF NEW JERSEY,
DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

      Plaintiff-Respondent,

v.

CENTENNIAL LAND &
DEVELOPMENT CORPORATION,
DEVEL, LLC, STEPHEN D. SAMOST,
TOWNSHIP OF MEDFORD, COUNTY
OF BURLINGTON, and CENTENNIAL
PINES CLUB,

      Defendants-Respondents,

and

CENTENNIAL PINES CLUB,

      Third-Party Plaintiff-Respondent,

v.

ESTATE OF JOSEPH SAMOST,

      Third-Party Defendant-Appellant.

_____

---

[1] Joseph Samost passed away during the pendency of this appeal. On July 8, 2019, we granted the Estate's motion to substitute in as a party to the appeal.

A-1414-17T3

Argued November 20, 2019 – Decided December 19, 2019

Before Judges Haas, Mayer and Enright.

On appeal from the Superior Court of New Jersey Chancery Division, Burlington County, C-000077-04.

Peter Jay Boyer argued the cause for appellant/cross-respondent Steven D. Samost in A-1414-17 and respondent Steven D. Samost in A-1616-17 (Hyland Levin, LLP, attorneys; Peter Jay Boyer, on the briefs).

Thomas Andrew Hagner argued the cause for respondent Estate of Joseph Samost in A-1414-17 and appellant Estate of Joseph Samost in A-1616-17 (Hagner & Zohlman, LLC, attorneys; Thomas J. Hagner and Thomas Andrew Hagner, on the briefs).

Paul Leodori argued the cause for respondents/cross-appellants Centennial Land & Development Corporation and Devel, LLC in A-1414-17 and respondents Centennial Land & Development Corporation and Devel, LLC in A-1616-17.

Aaron A. Love, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Aaron A. Love, on the brief).

Jay H. Greenblatt argued the cause for respondent Centennial Pines Club (Greenblatt & Laube, PC, attorneys, join in the brief of respondent Department of Environmental Protection).

Madden & Madden, PA, attorneys for respondent County of Burlington, join in the brief of respondent Department of Environmental Protection.

A-1414-17T3

PER CURIAM

This is the latest stage in protracted environmental litigation under the New Jersey Safe Dam Act, N.J.S.A. 58:4-1 to -14 (the Act), which the Department of Environmental Protection (DEP) commenced in 2004 seeking injunctive relief and civil monetary penalties against a number of individuals and entities. In the previous round of appellate litigation, this court affirmed a number of interlocutory trial court orders on the merits, including a June 9, 2014 order imposing civil monetary penalties upon appellants Joseph and Stephen Samost, and cross-appellant Centennial Land & Development Corporation (CLDC) (collectively appellants) under the Act. Dep't of Envtl. Prot. v. Centennial Land & Dev. Corp., No. A-4708-13 (App. Div. Oct. 21, 2016).

On October 10, 2017, the trial court entered final judgment regarding the civil monetary penalties against the Samosts and CLDC. These parties now challenge the entry of final judgment, but also purport to challenge the already-affirmed June 9, 2014 penalty order by presenting many of the same legal arguments this court has already determined lack merit. We again reject the parties' attempt to overturn the June 9, 2014 order because our prior opinion resolving the interlocutory appeal on the merits is the law of the case, and we affirm the entry of the October 17, 2017 final judgment.

4

I.

Centennial Lake is a fifty-three acre body of water located within Medford Township (Medford). Residential homes and some commercial properties are located downstream of the dam. The lake's water level is controlled by an eighteen-foot tall earthen dam known as the Centennial Lake dam.

The dam was originally constructed in the nineteenth century and underwent reconstruction in 1954. It is composed of a spillway, culvert, and embankment. Centennial Avenue traverses the top of the dam, the spillway is located upstream, and the culvert runs under the road.

In 1957, the Centennial Lake Company (Lake Company), which owned the dam, lake, and surrounding land, entered into a memorandum of agreement with the Centennial Pines Club (Pines Club) to redevelop the land surrounding the lake. The Pines Club is an association comprised of members who hold title to property or reside as tenants on property within the Centennial Lake development area. According to the agreement, upon development of a certain percentage of lots and the fulfillment of other conditions, the common areas owned by the Lake Company—including the dam—would be transferred to the Pines Club.

A-1414-17T3

In 1971, CLDC purchased the property owned by the Lake Company, including the dam. The transfers were subject to the 1957 agreement between CLDC's predecessor and the Pines Club. In 1972, Joseph Samost[2] became the president and sole officer of CLDC by acquiring all its stock. Since the early 1970s, Joseph's son, Stephen, acted as the attorney for or representative of CLDC and other companies owned by his father. Through all relevant periods of the litigation, CLDC owned the spillway and embankment of the dam, while the County of Burlington (Burlington) owned the dam's culvert. Medford owned an easement to operate and maintain the roadway over the dam.

In 1979, the United States Army Corp of Engineers (ACE) released a dam inspection report citing deficiencies and reporting the dam as a high hazard potential structure, based upon the potential impacts downstream if the dam were to fail. It found the spillway to be seriously inadequate and unsafe. According to the report, a major storm could have caused the dam to fail, resulting in the risk of downstream property damage and loss of life. The ACE report provided a number of recommendations that included performing studies regarding the spillway, designing modifications to improve the spillway,

---

[2] Because the Samosts share the same surname, we refer to them by their first names to avoid confusion. In doing so, we intend no disrespect.

clearing trees and brush from the embankments, and stabilizing eroded and bare areas along the embankment slopes.

DEP adopted the ACE's findings regarding the dam's classification as a high hazard. DEP ordered CLDC to make the repairs recommended in the ACE report.

In 1983, CLDC transferred its developable properties surrounding the lake to other entities controlled by Joseph. After the transfer, CLDC only owned the lake, dam, and beach. Through the 1980s, the entities controlled by Joseph filed applications to residentially develop the land surrounding the lake, which the Pines Club opposed in litigation.

The parties entered into a settlement agreement that established a maximum amount of development that could occur surrounding the lake. In 1985, the parties entered into a memorandum of agreement amending the 1957 agreement to establish that CLDC would convey its title to the lake, dam, and beach to the Pines Club after selling ninety percent of its waterfront lots and fifty percent of secondary lots. Pending the conveyance, CLDC agreed to maintain, manage, and control the lake, dam, and beach, at its own expense.

In 1989, Joseph transferred ownership of the lands surrounding the lake to entities controlled by Stephen. CLDC continued to own the lake bed, beach, and dam.

II.

CLDC did not comply with the DEP order to make the repairs set forth in the ACE report and ignored six additional DEP orders between 1981 and 1990 that contained similar directives. In April 1990, DEP inspected the dam and concluded that it was at risk of failure because of structural weakness in the culvert. In April and May 1990, DEP asked that CLDC, Medford, Burlington, and the Pines Club lower the level of the lake until further notice. The parties did not adhere to DEP's request.

Subsequently, DEP filed suit seeking injunctive relief and statutory penalties, claiming the dam was "at imminent risk of failing." In July 1990, the court ordered the parties to lower the level of the lake.

After an independent engineering report confirmed DEP's findings, DEP ordered CLDC, Medford, and Burlington to reconstruct the spillway and culvert and rehabilitate the earthen embankment. Burlington received a permit from DEP to replace the culvert in October 1990. Medcon Farms, an entity controlled by Stephen, received a permit for spillway reconstruction in December 1990.

However, neither Medcon Farms nor CLDC repaired the spillway. Burlington completed reconstruction of both the culvert and spillway in 1992 or 1993.

DEP determined that even with Burlington's repairs, the dam still did not satisfy regulatory safety requirements. The remaining issues involved whether grading and armoring the embankment was necessary to satisfy the regulatory standards, as DEP argued, and whether Burlington would be reimbursed for replacing the spillway, which CLDC owned. Settlement discussions ensued and, in 1993, Stephen sent a letter to the court indicating that an agreement had been reached. The court dismissed DEP's complaint with prejudice based upon that representation, even though there was no signed agreement. Negotiations for a settlement agreement eventually stalled, and the armoring was not done.

In 1998, litigation between Joseph and Stephen arose regarding the ownership of various properties owned by different family members. Although the origins of the litigation are unclear, the parties eventually found their way to federal court. The Pines Club sent letters to the court asserting an interest against the Samosts for unpaid expenses regarding the maintenance of the Centennial Lake properties in preceding years but did not intervene as a party. The litigation between Joseph and Stephen settled, but disputes arose as to implementation of the settlement, over which the federal court retained

A-1414-17T3

jurisdiction and appointed a special master. The federal judge overseeing the matter accepted the special master's recommendations and issued an order establishing that the responsibility for reimbursing the Pines Club for maintenance expenses would be borne by Joseph but ruled that the cost of repairing the dam and embankment would be borne by Stephen.

As a result of that litigation, Joseph agreed to transfer 100% of his stock in CLDC to Stephen, which took place on January 28, 2002. At some point thereafter, Stephen transferred his CLDC stock to Devel, LLC (Devel). Stephen owned a ninety percent interest in Devel, and his wife owned the other ten percent interest. In light of that transfer, Stephen considered himself the "president de facto and director de facto" of CLDC.

At some point in the early 2000s, the turnover threshold set forth in the 1985 memorandum of understanding between CLDC and the Pines Club was satisfied. However, the Pines Club refused to accept title to the lake and dam due to CLDC's failure to maintain and repair the dam.

In 2004, the federal court amended its previous order. It maintained that Joseph was liable for reimbursing the Pines Club, but instead of declaring Stephen personally liable for repairing the dam, as in the previous order, it

A-1414-17T3

declared CLDC liable. It also observed that Devel had become the owner of CLDC.

III.

CLDC failed to adhere to several orders and directives issued by DEP between 1997 and 2001. In January 2003, after Stephen acquired CLDC, DEP informed him that the dam must be rehabilitated further to come into compliance with the regulatory standards.

In May 2004, DEP filed an action against CLDC, Medford, Burlington, and the Pines Club. The complaint alleged that each defendant exercised ownership or control of the dam in various degrees and sought to hold them all liable for injunctive relief and civil monetary penalties under the Act. DEP sought to compel defendants to submit a dam safety inspection report, an emergency action plan, an operation and maintenance plan, and a final design report and permit application for the repair of the dam. DEP's primary concern when initiating the litigation was the dam's spillway, which it found was undersized for a dam classified as high hazard.

On July 27, 2004, CLDC recorded a deed dated July 22, 2004, purporting to convey the dam, lake, and beach to the Pines Club. On December 3, 2004, the Chancery Division entered an order setting aside the deed transfer and

declaring it "void ab initio and of no effect." The court reasoned that the 1985 contract to convey the deed required CLDC to make repairs and maintain the dam until the conditions for the transfer were satisfied, which it had not done. CLDC remained the dam's owner. The court also enjoined CLDC from transferring ownership pending further court order.

Later that same year, the Pines Club retained McCormick Taylor Engineering (McCormick) to prepare a regular dam inspection report. McCormick agreed with DEP that the dam was in an unsafe condition and the spillway was inadequate.

In 2004, Stephen also retained the services of an engineering firm, Underwood Engineering Company (Underwood), to inspect the dam. Underwood found deficiencies and recommended draining the lake immediately to allow a complete inspection of the dam.

On October 19, 2004, DEP ordered CLDC, Medford, Burlington, and the Pines Club to retain an engineer and implement the McCormick report's recommendations to "bring the structure into compliance with the Safe Dam Act and the applicable regulations." On April 7, 2005, DEP issued another order to the same effect, noting that the defendants had not yet complied. The second order included Stephen and Devel.

In 2005, DEP amended its complaint to include claims against Stephen and Devel. On April 26, 2006, the court denied CLDC's motion to dismiss the complaint. On October 3, 2006, the court denied reconsideration and partial summary judgment motions filed by CLDC, Devel, and Stephen.

CLDC, through Stephen, submitted an emergency action plan for the dam in June 2006, which DEP found to be defective. CLDC did not address the deficiencies. At some point, the Pines Club filed a third-party complaint against Joseph. In 2008, DEP amended its complaint to add Joseph as a defendant.

By May 2010, the repairs had not been completed. On November 30, 2010, the court granted DEP's partial motion for summary judgment, which sought a declaration that each defendant was liable for the repair and maintenance of the dam under the Act, as to CLDC, Devel, Stephen, Joseph, the Club, and Burlington. The court dismissed DEP's complaint as to Medford with prejudice.

On March 23, 2011, the court granted the Pines Club's motion for summary judgment against Joseph, which sought a declaration that he was liable for costs incurred by the Pines Club on lake and beach maintenance, and for any costs incurred by the Pines Club as a result of DEP litigation. The court also denied Joseph's cross-motion for summary judgment. On August 5, 2011, the

A-1414-17T3

court denied Joseph's motion for reconsideration. On January 6, 2012, the court issued another order declaring the July 22, 2004 deed void ab initio and restraining CLDC from transferring ownership of the property during litigation.

On March 9, 2012, the court issued an order and written decision apportioning defendants' liability to fund necessary studies and make repairs. It assigned 10% responsibility to the Pines Club, 45% to Joseph and CLDC, and 45% to Stephen and Devel. Burlington's responsibility was to be determined at a later date following engineering studies. On June 20, 2012, the court appointed a receiver to perform all obligations of the defendants with respect to the reconstruction and repair of the dam. On October 31, 2012, the court granted summary judgment to the Pines Club in relation to its third-party claims against Joseph. The court denied Joseph's motion for reconsideration on December 7, 2012.

In January 2013, DEP filed a motion for final summary judgment against defendants, seeking penalties for violations of the Act and for failing to comply with its enforcement orders. The court granted the motion on June 9, 2014 and issued an order and detailed written decision. It declared CLDC, Devel, Stephen, and Joseph liable for civil penalties of $750,000 for the period between

14

May 1994 and June 2014. Of that amount, the court assessed $50,000 solely against the Pines Club.

In March 2014, McCormick issued a report following its inspection of the dam on behalf of the court-appointed receiver. McCormick found the dam to be in "poor condition," and recommended several improvements and additional studies. On June 26, 2014, the court assessed costs for engineering design and permitting against the defendants. The payments were to be made to the court-appointed receiver.

IV.

CLDC, Devel, and Stephen filed a motion for leave to appeal nine court orders issued between December 2004 and June 2014.[3] Joseph filed a cross-

---

[3] These parties challenged the December 3, 2004 order rescinding CLDC's deed transfer to the Pines Club; the April 26, 2006 order denying CLDC's motion to dismiss the complaint; the October 3, 2006 order denying reconsideration and denying partial summary judgment to CLDC, Devel, and Stephen; the November 30, 2010 order granting partial summary judgment to DEP; the March 23, 2011 order granting summary judgment to the Pines Club against Joseph and denying Joseph's cross-motion; the August 5, 2011 order denying Joseph's motion for reconsideration; the March 9, 2012 order apportioning liability among defendants; the May 30, 2012 order denying reconsideration; and the June 9, 2014 order fixing statutory penalties.

A-1414-17T3

motion for leave to appeal challenging some of the same orders.[4] Joseph's cross-appeal also challenged four additional orders.[5] The Pines Club filed a cross-appeal challenging provisions of the November 30, 2010, March 9, 2012, and June 9, 2014, orders.

On September 12, 2014, this court granted interlocutory review, but did not stay the trial court's orders. On October 21, 2016, we issued a fifty-one-page decision affirming all of the challenged orders on the merits. We subsequently denied Joseph's motion for reconsideration and, on March 23, 2017, the Supreme Court denied motions for leave to appeal filed by Stephen, CLDC, and Devel, and dismissed Joseph's cross-petition for certification.

## V.

Following our decision, DEP moved before the trial court for entry of final judgment on the previously awarded civil penalties. On October 10, 2017, the

---

[4] These orders included the November 30, 2010, March 23, 2011, August 5, 2011, March 9, 2012, and June 9, 2014 orders noted above.

[5] Joseph challenged the June 20, 2012 order appointing a receiver for the dam repairs; the October 31, 2012 order granting final summary judgment to the Pines Club, dismissing Joseph's complaint against CLDC, and denying his motion for summary judgment; the December 7, 2012 order denying reconsideration; and a December 18, 2012 order that apportioned payment for engineering costs.

court entered the requested order. In doing so, the court found no justifiable reason to delay enforcement of the penalty.

On November 24, 2017, Stephen filed a notice of appeal challenging the court's October 10, 2017 order. In his case information statement, Stephen indicated that he also challenged the court's June 9, 2014 order imposing penalties, which he had already unsuccessfully appealed in Centennial Land & Dev.

In response to Stephen's appeal, CLDC filed a notice of cross-appeal challenging the October 10, 2017 order.[6] Although its notice of cross-appeal only mentions the October 17, 2017 final judgment, in its case information statement, CLDC noted that it challenges the underlying June 9, 2014, order imposing penalties.

Joseph also filed a notice of appeal of the October 10, 2017 order on November 27, 2017. Like Stephen, Joseph also purported to appeal the June 9, 2014 order, despite the court's prior decision affirming that order. We

---

[6] The cross-appellant's brief refers to Devel as an additional cross-appellant, but the notice of appeal filed on January 5, 2018, only mentions CLDC as the cross-appellant. Both parties are represented by the same counsel, and as discussed, Devel is the owner of CLDC. To avoid confusion, we hereafter collectively refer to CLDC and Devel as CLDC.

subsequently granted DEP's motion to consolidate the appeals and, after Joseph passed away, granted a motion to substitute his Estate as a party.

VI.

As noted at the outset, appellants devote most of their appellate briefs to their attacks on the June 9, 2014 order holding them liable for the penalties imposed by DEP. However, we upheld that order in our prior decision and, therefore, appellants' challenges are barred by the law of the case doctrine.

"[W]hen an issue is once litigated and decided during the course of a particular case, that decision should be the end of the matter" and is "binding" upon "a different appellate panel which may be asked to reconsider the same issue in a subsequent appeal." State v. Hale, 127 N.J. Super. 407, 410 (App. Div. 1974). Accordingly, appellate courts reject an appellant's "attempts to reargue various matters which were previously decided by this court." Elmora Hebrew Ctr., Inc. v. Fishman, 239 N.J. Super. 229, 232 (App. Div. 1990).

"Under the law of the case doctrine, an interlocutory ruling by the Appellate Division generally is not subject to review on direct appeal." Lombardi v. Masso, 207 N.J. 517, 539 (2011); see also Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 2:2-4 (2020). "An appellate decision which is interlocutory in the sense that it does not terminate the case nevertheless

finally decides the meritorious issue." State v. Myers, 239 N.J. Super. 158, 164 (App. Div. 1990). "That the decision was interlocutory does not mean that it was 'tentative and subject to more leisurely review at a later date.'" Ibid. (quoting State v. Stewart, 196 N.J. Super. 138 (App. Div. 1984)).

Thus, "[w]hen a party appeals from a final judgment, the party may seek review of interlocutory orders that have not been . . . definitively ruled upon by an appellate court in a prior or separate appeal." Silviera-Francisco v. Bd. of Educ. of Elizabeth, 224 N.J. 126, 140-41 (2016) (emphasis added); see also Washington Commons v. City of Jersey City, 416 N.J. Super. 555, 564 (App. Div. 2010) ("[I]f an issue, such as one concerning a variance, has been determined on the merits in a prior appeal it cannot be relitigated in a later appeal of the same case, even if of constitutional dimension."); Pressler & Verniero, cmt. 2.3.3 on R. 2:2-3.

The doctrine is a discretionary policy, not an absolute rule. Gonzalez v. Ideal Tile Importing, 371 N.J. Super. 349, 356 (App. Div. 2004). Accordingly, "[t]he respect and deference which should be given to prior rulings in the same case 'must be balanced against other considerations, particularly the impact of new law or new facts,' or . . . where the confusing nature of the prior decisions requires clarification." Ibid. (quoting Rosenberg v. Otis Elevator Co., 366 N.J.

Super. 292, 302 (App. Div. 2004)).  The doctrine may be relaxed "if the interests of justice will be served," in particular "where there has been an intervening and retroactive change in the law" that "might affect a non-final mixed factual and legal adjudication."  Sisler v. Gannett Co., 222 N.J. Super. 153, 160 (App. Div. 1987).  When "applied to a prior appellate decision in the same case, the [law of the case] doctrine is more stringent."  Ibid.

As previously noted, we squarely rejected the parties' challenges to the June 9, 2014 order on the merits in our 2016 decision.  Centennial Land & Dev., slip op. at 36.  Although the parties also purport to appeal the October 10, 2017 final judgment,[7] it is clear that the focus of their appeals is to once more challenge the June 9, 2014 penalty order, which this court already affirmed on the merits.  Under the law of the case doctrine, the Estate, Stephen, and CLDC are clearly barred from again attacking this order.

Even if we were to consider appellants' arguments, we would again reject them because they are largely identical to the contentions we found lacked merit

---

[7] Of the many arguments presented in the Estate's fifty-five-page brief, only the final one, consisting of approximately one page, challenges the entry of the October 10, 2017 final judgment.  Stephen dedicates just a few sentences of his forty-page brief to challenge the entry of that judgment.  CLDC's brief makes no attempt to challenge the October 10 judgment at all.  All the other issues and arguments asserted by the parties challenge the already-affirmed June 9, 2014 order imposing penalties.

20

in our 2016 decision. For example, the Estate claims Joseph did not own or control the dam during the relevant periods. However, this court expressly held that Joseph is liable because he controlled the dam over a relevant period. Centennial Land & Dev., slip op. at 40-41.

The Estate also argues that the trial court misconstrued the Act by improperly relying upon Department of Environmental Protection v. Ventron Corp., 94 N.J. 473 (1983), the Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11, and Department of Environmental Protection v. Standard Tank Cleaning Corp., 284 N.J. Super. 391 (App. Div. 1995), to find corporate officer liability. Contrary to the Estate's claim, this court cited both Ventron and the Spill Act with approval in its decision when finding Stephen responsible under the Safe Dam Act as a corporate officer. Centennial Land & Dev., slip op. at 28-29.

The Estate also argues that a trial was warranted to resolve ownership and control issues. However, this court previously held that it was "unfounded . . . that summary judgment was obviated by material factual disputes." Id. at 42. The Estate's related argument that the trial court erred when finding that Joseph waived a plenary hearing is undercut by this court's holding that the factual record did not warrant a plenary hearing. Id. at 42-43.

21

The Estate asserts that the federal settlement that resulted in Joseph's transfer of the dam to Stephen relieved Joseph of liability, but this court already "disagree[d] with Joseph's contention that his transfer of the dam in 2001, severed his liability under the Act." Id. at 40.

The Estate's argument that the court erred "as a matter of law" when awarding statutory penalties against Joseph is composed of several sub-arguments, all of which this court rejected on the merits in Centennial Land & Dev. Regarding the Estate's sub-argument that penalties under the Act were inappropriate because none of DEP's directives were issued to Joseph personally, this court held that this claim was "untenable" because Joseph knew that problems existed with the dam beginning with the 1979 ACE report. Id. at 44. The Estate also asserts that the penalties were arbitrary because the court improperly excluded Burlington and the Pines Club from the penalty award, but this court has already ruled that there was no abuse of discretion in excluding Burlington. Ibid. As noted, the penalty award did not exclude the Pines Club. This court's prior finding that the penalty order "reflects a reasoned exercise of discretion" undermines any other basis for arbitrariness the Estate presently asserts. Id. at 44. The Estate claims DEP waived its claim for statutory penalties, but this court rejected Stephen's similar argument in the interlocutory

appeal. Id. at 31-32. The Estate also maintains that DEP's penalty claims were time-barred, but this court expressly rejected that theory. Id. at 37-38.

Finally, the Estate claims that DEP's application for penalties was procedurally defective under the rules governing verified complaints. Joseph presented the same argument to this court in his brief supporting the interlocutory appeal, and we rejected this contention because Joseph failed to timely present it to the trial court. Id. at 44.[8]

Stephen's appeal suffers from the same infirmities. He first argues that he was immune from Safe Dam Act liability because, in his view, the Act precludes liability solely upon status as a corporate officer. However, in Centennial Land & Dev., we expressly rejected that theory, holding that "acts by individuals exercising control of a dam, even if through a corporate entity, fall within" the Act's purview. Id. at 26. We also rejected Stephen's argument that he was immune from penalties because he was not specifically named in any DEP order.

---

[8] In any event, the argument is meritless. The Estate relies upon Rule 4:70, which does require a verified complaint, but governs "an action to enforce a civil penalty imposed by any statute or ordinance providing for its collection or enforcement by a civil proceeding." R. 4:70-1(a). DEP did not file its complaint as a mere collection action; its complaint sought injunctive relief and statutory penalties from the court pursuant to N.J.S.A. 58:4-6(e), which permits DEP to initiate a private action under the Act in Superior Court, in lieu of imposing civil administrative penalties.

This court held that at least one order and DEP notice identified Stephen, that Stephen's responsibility to act was stated in the federal litigation, and that, "[t]he fact that further orders from [DEP] were not directed to Stephen is of no consequence." Id. at 35.

In this appeal, Stephen also argues that he reasonably believed he had no personal responsibility for repairing the dam because of a federal court order and precedent from this court. We rejected this argument in our 2016 decision and noted that a 2001 federal order declared Stephen personally responsible for repairing the dam. Id. at 34. Although the federal court amended the order in 2004 after Stephen transferred his ownership in CLDC to Devel, this court held that, "this change in ownership, initiated solely by Stephen to his controlled holding company, does not erase his responsibility." Ibid.

To support his argument that he reasonably relied upon precedent from this court, Stephen cites Asdal Builders v. Department of Environmental Protection, 426 N.J. Super. 564 (App. Div. 2012). In Asdal, this court held that, under the Flood Hazard Area Control Act (FHACA), N.J.S.A. 58:16A-50 to -68, the implementing regulations' use of the term "person" did not encompass a "responsible corporate officer," prior to an amendment that made the inclusion explicit. Id. at 578-79. Although this court's previous decision did not directly

24

A-1414-17T3

cite Asdal,[9] it squarely rejected the theory that "the absence of inclusion of a 'responsible corporate officer' within the definitions of 'person' restricts the [Safe Dam] Act's scope and precludes an individual obligation to pay for the dam repairs and maintenance or penalties." Centennial Land & Dev., slip op. at 25. This court held that, "acts by individuals exercising control of a dam, even if through a corporate entity, fall within N.J.S.A. 58:4-5 [declaring responsibilities with respect to dam maintenance] and -6 [providing for statutory penalties]." Id. at 26. Further, because Asdal says nothing regarding the Act, it is unclear how Stephen could have reasonably relied upon it when seeking to shirk responsibility for maintaining the dam using holding companies.

Another of Stephen's current arguments challenges the allocation of penalties for periods when he alleges he was not a corporate officer of CLDC. The matter of penalty allocation was briefed extensively in the interlocutory appeal, and this court was "not persuaded the [trial] judge erred in her

[9] In their reply briefs, the Estate and Stephen unpersuasively argue that our prior decision should not be considered the law of the case because it "disregarded" the holding in Asdal. However, Asdal predates the court's decision resolving the interlocutory appeal, and thus does not constitute an intervening change in the law that warrants relaxation of the law of the case doctrine. Further, as discussed, although this court did not directly cite Asdal, we implicitly rejected importing its holding relating to corporate officer liability under the FHACA into the Safe Dam Act context. The Estate and Stephen fail to demonstrate how Asdal warrants relitigating the same order that this court has already affirmed.

A-1414-17T3

application of N.J.S.A. 58:4-6 or that she abused her discretion in the ordered allocation." Id. at 30.

Finally, this court's prior decision also addressed Stephen's argument that the Act does not authorize penalties covering the period before March 9, 2012, when the trial court issued an order apportioning the defendants' liability for ongoing repairs. As noted, in resolving the interlocutory appeal on the merits, we rejected the theory that Stephen is not subject to penalties because he was not named in earlier DEP orders. Id. at 34. This court found that Stephen was a "person having control of the dam" and thus squarely within the Act's purview. Id. at 32-35. Thus, not only do the parties attempt to appeal the same order twice, the Estate and Stephen rehash many of their same failed arguments.

Stephen argues that this court's prior decision is not the law of the case because unlike the previous challenged orders, the October 10, 2017 order declares the defendants jointly liable. We disagree.

The June 9, 2014 order specifically states that CLDC, Devel, Stephen, and Joseph are "liable for civil penalties in the amount of $750,000 for the period of May 1994 through June 2014," with $50,000 of that amount assessed to the Pines Club. The October 10, 2017 order merely added the word "jointly" when reducing the award to a final judgment, noting that CLDC, Devel, Stephen, and

Joseph were jointly liable for $700,000.  Although the June 2014 order did not use the word "jointly," it is clear that the assessment of a single monetary penalty against multiple defendants was a joint penalty assessment.  Cf. Fid. Union Bank v. United Plastics, 218 N.J. Super. 381, 389 (App. Div. 1987) (observing that judgment "against the individual defendants" imposed joint and several liability).  Furthermore, the trial court's detailed written decision accompanying the June 9, 2014 order explained that the fines were "collective" and that Joseph and Stephen were "jointly liable" together with CLDC and Devel.  Thus, the October 10, 2017 order did not change the penalties in any appreciable way.  It merely reduced the penalties to a final judgment to permit DEP to begin collection efforts.

Thus, under the law of the case doctrine, Joseph's and Stephen's challenge to the June 9, 2014 order must fail.  And, as discussed in detail above, even if we were to consider appellants' contentions anew, they continue to lack any merit.  Therefore, we again affirm the June 9, 2014 order.

VII.

In its cross-appeal, CLDC raises arguments this court did not previously address in Centennial Land & Dev.  However, CLDC was an appellant in the prior appeal involving that order and was obligated to raise any arguments it had

27

concerning that order at that time. See State v. Lefante, 14 N.J. 584, 591 (1954) (holding that an appellant "must present all arguments in support of his [or her] stand" and, if the party "fails to present all of the points on which he [or she] rests [their] case[,] [the party] is deemed to have waived them and . . . cannot at some later stage in the same proceeding . . . argue points which [the party] has in effect abandoned"). Therefore, CLDC's challenge to the June 9, 2014 order must also fail under the law of the case doctrine.

Nevertheless, we will briefly address CLDC's newly minted arguments for purposes of completeness. CLDC challenges the 2014 order's imposition of penalties as violating its due process rights, the "square corners" doctrine, and notions of "fundamental fairness." These arguments lack merit.

"In New Jersey, as elsewhere, '[t]he essential components of due process are notice and an opportunity to be heard.'" First Resolution Inv. Corp. v. Seker, 171 N.J. 502, 513–14 (2002) (quoting Mettinger v. Globe Slicing Mach., 153 N.J. 371, 389 (1998)). CLDC premises its due process argument upon the notion that it litigated issues of ownership and control over the dam in good faith over many years. According to CLDC, the imposition of penalties covering those periods of litigation violated its right to a "chance to know the opposing evidence and argument and to present evidence and argument in response."

Tosco Corp. v. N.J. Dep't of Transp., 337 N.J. Super. 199, 208 (App. Div. 2001) (quoting High Horizons Dev. v. Dep't of Transp., 120 N.J. 40 (1990)). In other words, CLDC claims it is immune from any penalties during periods in which the parties litigated bona fide factual disputes regarding the allocation of responsibility for the dam. We disagree.

Notice is not an issue here because it is undisputed that CLDC owned at least part of the dam between 1994 and 2014, the entire penalty period, and actively participated in litigation regarding its responsibility under the Safe Dam Act. CLDC's status as an owner under the Act, and at least some degree of responsibility, was never in question.

Further, CLDC fails to show how it was deprived of a meaningful opportunity to be heard regarding ownership and control issues. CLDC litigated those issues over a long period and asserts no procedural defects in the trial court or this court. The mere fact that multiple parties were ultimately found to be partially responsible for the dam repairs and penalties does not excuse all the parties from any liability over a twenty-year period of contentious litigation. See Centennial Land & Dev., slip op. at 35 (holding that the Act "permits penalties to be imposed jointly and severally on two or more owners or persons

A-1414-17T3

having control over a dam at different or at the same time for continuing violations.").

Additionally, accepting CLDC's argument that it is immune from responsibility while litigating ownership issues would vitiate the purpose of the Act, remedial legislation under which DEP "is vested with sweeping regulatory and enforcement powers" to ensure the safety of dams. N.J. Dep't of Envtl. Prot. v. Alloway Twp., 438 N.J. Super. 501, 504 (App. Div. 2015). The Act "casts a 'broad net' of liability . . . so that its remedial purpose—'to protect the public from the loss of life and property in the event a dam fails, regardless of whether it is privately or publicly owned'—is served." Ibid. (citation omitted). Certainly, the Act does not allow violators to skirt responsibility by the mere fact of litigation, and CLDC fails to demonstrate how its right to due process demands such an absurd result.

CLDC also argues that the penalties are impermissible because DEP failed to "turn square corners" in its dealings with defendants. In support, it cites a 2004 email from the Pines Club president, which claims DEP officials admitted to him that the dam was safe. That email constitutes uncorroborated double hearsay, and as discussed, DEP issued several orders and directives to the dam owners between 1997 and 2003, prior to filing the lawsuit in 2004. Additionally,

in 2004 both the Pines Club and Stephen, who controlled CLDC, commissioned engineering studies that agreed the dam was not safe. Therefore, CLDC's argument on this point is not supported by the record.

Next, CLDC suggests it is "fundamentally unfair" to hold it partially liable for the statutory penalties because the court did not find that it was "exclusively responsible for repairing and/or maintaining the dam." However, the very nature of a joint penalty, such as that awarded here, suggests that no single party was solely responsible for the failure to repair the dam. The Act subjects any "person" who fails to adhere to any of its provisions, or fails to adhere to an administrative order, to civil penalties. N.J.S.A. 58:4-6(e). Nothing in the Act prevents DEP or a court from considering multiple parties to be partially responsible and jointly subject to civil penalties, and nothing suggests that such an outcome is fundamentally unfair. See Centennial Land & Dev., slip op. at 35-36.

Additionally, the trial court's joint penalty is not "fundamentally unfair" because it is largely consistent with the court's earlier ruling allocating responsibility for funding dam studies and making repairs. The court assigned 10% responsibility to the Pines Club, 45% to Joseph and CLDC, and 45% to Stephen and Devel. That Joseph, CLDC, Devel, and Stephen are jointly

31

responsible for the penalties is largely consistent with the finding that they are responsible for the dam in equal measure.[10] Accordingly, CLDC's challenges to the June 9, 2014 order lack merit.

In sum, CLDC's attempt to re-litigate the propriety of the June 9, 2014 order fails under the law of the case doctrine, and the arguments it raises in this appeal are meritless. Therefore, we affirm the June 9, 2014 order.

## VIII.

Stephen and the Estate next challenge the trial court's entry of final judgment on October 10, 2017. However, we discern no basis for disturbing it.

Pursuant to Rule 4:42-2, a trial court may enter final judgment regarding an order subject to enforcement under Rule 4:59 that resolves fewer than all the claims if: 1) there is no just reason to delay enforcement; and 2) upon either a complete adjudication of a separate claim, a complete adjudication of all the

---

[10] CLDC also claims that Medford was incorrectly dismissed from the litigation because it is an "owner" of the dam and should share in the liability with appellants. However, CLDC did not appeal from the November 30, 2010 order dismissing Medford from the case. Because "it is clear that it is only the judgment or orders designated in the notice of appeal which are subject to the appeal process and review," CLDC "has no right to [this court's] consideration of this issue." 1266 Apartment Corp. v. New Horizon Deli, 368 N.J. Super. 456, 459 (App. Div. 2004). Moreover, CLDC already unsuccessfully appealed the November 30, 2010 order in the interlocutory appeal. Therefore, we reject CLDC's argument on this point.

rights and liabilities asserted in the litigation as to any party, or where a partial summary judgment or other order for payment of part of a claim is awarded. The appealability of a certified final judgment is "an ancillary consequence" compared to the rule's primary purpose of permitting execution by the prevailing party. D'Oliviera v. Micol, 321 N.J. Super. 637, 641 (App. Div. 1999).

In this case, there is no question that the monetary penalty award is an order subject to enforcement under Rule 4:59, as it required payment within sixty days. The parties do not challenge the trial court's finding of no just reason for delaying enforcement of the civil penalties. Nor do they challenge the court's finding that DEP's claim for civil penalties under the Safe Dam Act was completely adjudicated, and that appellants exhausted all avenues of appealing the underlying penalty order.[11]

The Estate first argues that the court erred by finalizing the judgment because the underlying penalty award was defective. As the trial court explained, and as noted repeatedly herein, defendants already unsuccessfully appealed the underlying order. Therefore, that argument fails.

---

[11] In its decision, the trial court explained that the only remaining issues are indemnification claims between the defendants, which will not affect DEP's penalty award.

The Estate also argues that entry of final judgment "created an otherwise avoidable procedural anomaly." It claims the trial court should have issued an order finalizing the March 9, 2012 order, which declared the parties' respective liability for funding dam studies and repairs, to prevent confusion as to which issues are under appellate review. This argument fails because the March 9, 2012 order was part of the interlocutory appeal. Thus, even if the court had finalized that order, defendants would not be entitled to a second attempt at challenging it on appeal. Further, the Estate fails to demonstrate any confusion caused by the fact that the March 9, 2012 order is not a certified final judgment.

For his part, Stephen does not challenge the entry of final judgment itself. Rather, he argues that the court erred by awarding interest on the penalties. We disagree.

Although the June 9, 2014 order required payment within sixty days, the trial court subsequently granted defendants' request for an extension to October 8, 2014. The court's October 10, 2017 entry of final judgment ordered simple interest to run from October 8, 2014, in accordance with the annual rates provided by the Court Rules.

Stephen relies upon a provision of the Act governing the imposition of civil administrative penalties, N.J.S.A. 58:4-6(d), which limits the applicability

A-1414-17T3

of interest in situations where a civil administrative penalty is contested. He claims that because the penalty order was "hotly contested," the court's "award of prejudgment interest on those penalties for any period prior to the date of the final Order" violated the Act.

As an initial matter, Stephen's reference to prejudgment interest is misplaced, as the court ordered post-judgment interest running from the date on which defendants were obligated to make the payment and said nothing regarding prejudgment interest. Further, the statute Stephen cites only discusses post-judgment interest. N.J.S.A. 58:4-6(d).

Assuming Stephen intended to argue that the Act precludes a court's ability to impose post-judgment interest, he misunderstands the difference between administrative and judicially-imposed penalties. The Act provides DEP the option of either imposing civil administrative penalties or seeking a court order imposing penalties. N.J.S.A. 58:4-6(d), -6(e). In this case, DEP chose the latter option by filing its complaint in the Superior Court. Accordingly, the action is governed by the Court Rules, not the provision Stephen cites, which applies to the process of imposing civil penalties in the administrative context.

The Court Rules allow for post-judgment interest on all "judgments, awards and orders for the payment of money." R. 4:42-11(a). Post-judgment interest is "generally available" for civil penalties authorized by statutes that provide a cause of action in the Superior Court. United Consumer Fin. Servs. v. Carbo, 410 N.J. Super. 280, 313 (App. Div. 2009) (holding that trial court did not sufficiently explain its decision to deny post-judgment interest on civil penalties issued pursuant to consumer protection statutes). The court's imposition of post-judgment interest running from the date on which the payment obligation became past due was thus permissible under the Rules.

Accordingly, we reject appellants' arguments on this point, and affirm the October 10, 2017 final judgment.[12]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[12] As for the balance of any of appellants' arguments not expressly discussed above, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-1414-17T3